VICTOR ROLAND O'SHEA

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 20, 1905.*

1. CRIMINAL LAW—*jury should not be given intimation of trial judge's view of defense of insanity.* Where the sole defense to a prosecution for murder is insanity, the evidence being conflicting and the question close, it is important that the jury be left to consider the evidence without anything which could have been regarded by the jury as an intimation of the view of the trial judge as to the merits of the defense.

2. SAME—*defense of insanity involves question of the accused's knowledge of right and wrong.* The defense of insanity involves the accused's knowledge of right and wrong, and it is error for the trial judge, in cross-examining the witnesses for the accused in the presence of the jury, to state that insanity does not involve the question of right and wrong.

3. SAME—*when cross-examination by trial judge is ground for reversal.* Persistent cross-examination by the trial judge of witnesses testifying for the accused upon the defense of insanity, by which false tests of sanity are suggested to the jury and from which the jury might well conclude that the defense was without merit unless it was proved by positive testimony that the accused was an imbecile or the victim of an insane delusion, is ground for reversal.

4. SAME—*trial judge must exercise great care, in cross-examining witnesses, to preserve impartial demeanor.* Where the trial judge in a criminal case deems it necessary to cross-examine witnesses in order to prevent a miscarriage of justice, he must exercise great care to prevent giving the jury the impression that he is biased against the accused, and he must not forget the function of a judge and assume that of an advocate.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. W. M. McEWEN, Judge, presiding.

Victor Roland O'Shea, the plaintiff in error, was indicted in the criminal court of Cook county, on September 22, 1902, for the murder of his wife, Amy M. O'Shea, on September 10, 1902. A trial was had, which, on November 15, 1904, resulted in a disagreement of the jury. Upon

a second trial the jury found him guilty of manslaughter. After overruling a motion for a new trial and a motion in arrest of judgment, the court entered judgment upon the verdict and sentenced the defendant to the penitentiary at Joliet. The record of the criminal court is brought to this court for review by writ of error.

O'Shea, (hereinafter referred to as the defendant,) at the time he killed his wife, was twenty-two years old. The maiden name of the deceased was Hogenson. He met her for the first time at Lake Villa, Ill., during the year 1899. After their return to Chicago he frequently called upon her at her home in Chicago, where she resided with her parents. Neither her father nor mother made any objection to the defendant's visits, but apparently encouraged them. On July 2, 1901, that being the defendant's twenty-first birthday, he was secretly married to Amy M. Hogenson at Waukegan, Ill. They immediately returned to Chicago and lived at their respective homes and conducted themselves, to all outward appearances, as though they were still unmarried. At the time of the marriage he was a student and clerk in the law office of his father, with whom he lived. He earned about $8 per week. In the fall of 1901 the parents of the wife learned of the marriage of their daughter to the defendant. Her father had a conversation with him, and upon being informed that his income amounted to only $8 per week and that he was unable to support a wife, upbraided him for getting married. Thereafter the defendant continued to call on his wife at her home, but his relations with her parents were strained and unpleasant, and it appears that the frequency of his visits was objected to by the parents, and that they tried to limit them to one or two a week in number.

On the evening of September 9, 1902, the defendant called at his wife's residence and inquired of her mother if she was at home. Upon being informed that she was not, he went away and returned later, when he was told, through a speaking tube, by Mrs. Hogenson, that his wife

218—23

had returned but had gone to bed, and that she had told her mother to tell him that she would not see him that night but for him to come the next day. On the following morning he went to the house shortly after nine o'clock. The Hogenson home was the second flat of a building on West Division street. He was admitted to the parlor by his wife, and the two sat down in that room. Mrs. Hogenson was at work in the kitchen. The doors between the parlor and kitchen were open and she was able to see into the parlor. The defendant and the deceased talked in a low tone, and Mrs. Hogenson could not distinguish what was said by either of them. After the defendant had been in the room about twenty minutes, his wife went into the kitchen for a glass of water and returned with it to the parlor. Several minutes afterwards the defendant and his wife went into the hall, and soon afterwards Mrs. Hogenson heard shots proceeding therefrom. She seized a small club and ran into the hall, where she found her daughter lying upon the floor, shot twice in the breast, and the defendant upon the stairs leading down from the flat, with a revolver in his hand. She attempted to strike him with the club, but dropped it down the steps. He advanced up the steps towards her and she ran into the parlor, locking the door after her. Soon thereafter she heard more shots proceeding from the hall. Seizing a piece of a broken bedstead she again went into the hall and found the defendant lying upon the floor. He had shot himself twice in the breast, a little to the right of the heart. The wife of the defendant died almost immediately from the wounds received by her. The defendant was taken by the police to a hospital, where he remained for a period of three months, and he was under the care of surgeons for more than six months before he recovered.

Up to the time of the tragedy the relations existing between the defendant and his wife were apparently those of affection and devotion to each other.

The defendant did not deny the killing in the manner and under the circumstances above stated, but pleaded insanity at the time of the homicide as a defense. A large number of witnesses testified that he was insane at the time of the homicide and for a period of several months prior thereto, while others, called by the People, were of the contrary opinion.

Grounds relied upon for a reversal of the case are, that the verdict was against the manifest weight of the evidence; that the trial court erred in giving to the jury certain instructions for the People, and that the judge before whom the case was tried conducted a cross-examination of a number of the defendant's witnesses in an improper and prejudicial manner, and asked them questions which were not proper to be asked even by the attorney for the People on cross-examination.

HENRY E. MURPHY, and P. J. O'SHEA, (JAMES HAMILTON LEWIS, of counsel,) for plaintiff in error.

WILLIAM H. STEAD, Attorney General, and GEORGE GILLESPIE, (JOHN J. HEALY, State's Attorney, and HARRY OLSON, of counsel,) for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The defense interposed was insanity. The evidence was very conflicting. Thirty-one witnesses testified that O'Shea was insane at the time of the homicide, while sixteen witnesses, called on behalf of the prosecution, testified that he was sane at that time. A careful examination of the testimony of these witnesses leads us to the conclusion that those who testified on the part of O'Shea were better qualified by observation of and association with him to know what his mental condition was. They seem to have testified as fairly and candidly as, and were not inferior in intelligence to, those who spoke for the People. It was

highly important that the jury should have been left to consider the evidence without anything whatever intervening which could have been regarded by them as an intimation of the view of the trial judge in regard to the merits of the plea of insanity.

In the cross-examination of several of the lay witnesses called by O'Shea who testified to his insanity, the presiding judge took an active part. On some occasions, after the cross-examination conducted by the prosecuting officer had proceeded for some time, the judge took up and conducted the cross-examination at some length, and when his interrogatories were ended the cross-examination was resumed by the prosecutor. At other times the judge's cross-examination followed that of the People's representative. The cross-questions propounded by the judge were vigorously objected to by the attorney for O'Shea, the objection in every instance being promptly overruled without discussion.

Among the witnesses called by the defendant below was Edward G. Stockert, an attorney at law, who testified, on his direct examination, to a large number of circumstances affording foundation for the conclusion finally sworn to by him that O'Shea was insane at the time the fatal shots were fired. The assistant State's attorney then cross-examined him very fully. The witness was examined on re-direct, and the judge then cross-examined him. Space forbids that we re-produce this entire examination, as it covers six pages of the typewritten transcript of the record. We set out sufficient thereof to show the objectionable character of some of the questions propounded. Interrogatories of the same general character were asked by the judge of each witness whom he cross-examined.

By the court:    *   *   *

"Q. How would you define the condition of mind in which a man is when he does not know the difference between right and wrong—how would you describe it?—A.

Well, I would say I am not an expert on insanity. I would
say he was mentally unbalanced. That is about the only
expression I would use.

"Q. Well, are you of the opinion that every person
who is mentally unbalanced does not know the difference
between right and wrong?—A. . Well, I believe some people
are unbalanced on certain occasions. They have intervals
when they are perfectly lucid. Some people are unbalanced
on certain things, certain subjects.

"Q. Are there conditions of lack of mental balance
where a party does know the difference between right and
wrong?—A. I do not know. I am not an expert.

"Q. Insanity does not involve the question of right
and wrong.—A. I am not an expert on insanity. I am not
a student of the subject,—would not want to be. * * *

"Q. Do you think that the defendant had such men-
tality as that he comprehended what he was doing?—A.
Well, he could not tell whether the action was right or
wrong; he could not distinguish between them. I am sure
of that.

"Q. Well, that is not an answer to my question.—
A. I do not know whether he knew that or not. I would
not want to say whether he knew or not. I could tell you
what he told me afterwards in regard to that. That is the
only thing upon which I could base my opinion upon it.

"Q. You better not; that is not admissible. Do you
think that he knew that he was armed with a weapon
which would discharge bullets and produce death if fired
into a vital spot?—A. Well, I knew always that he did
carry a revolver because of collecting his money for the
distilling company.

"Q. Well, I think I will have to strike that out. What
I am asking you is whether, at the time he was firing the
shot, whether he knew he was firing a revolver loaded which
would discharge a bullet into his wife? Do you think he
knew the identity of his wife and do you think he knew

he had a revolver in his hand with a trigger, and that it required pulling of the trigger to discharge weapon? Do you think he apprehended all these things in that act?— A. I do not think he appreciated all of these things in that act. I think he was in such a state of mind if he had apprehended it he would not have done it.

"Q. Would you say that his mind was in a delusionary state? What do you say about that? Do you think his mind—are you of the opinion that his mind was in a delusionary state at that time,—that he was imagining a condition of things that did not exist? For instance, that he was shooting some one who was not a human being, perhaps in some sort of mental wandering of mind, so there was a delusionary state of things?—A. That may have been.

"Q. Have you any opinion on that?—A. Well, I do remember of his saying something about—

"Q. No, that is not the question. Have you an opinion—it is not what you remember about—have you actually the opinion?—A. He may have been laboring under a delusion of that kind. I don't know. I really haven't an opinion, Mr. McEwen."

To another witness the judge propounded such questions as: Do you think he knew enough to go home? What car to take? Were you of the opinion that he could find his way home at that time? And further, whether O'Shea knew the revolver from its pouch; whether he knew the trigger from the hammer of the revolver; whether he knew which he pulled, the hammer or the trigger; whether he knew that his wife was a human being.

We regard as error the question or suggestion of the judge to the effect that "insanity does not involve the question of right and wrong." Where insanity is interposed as a defense to crime, it involves the defendant's knowledge of right and wrong, (*Hornish* v. *People,* 142 Ill. 620; *Meyer* v. *People,* 156 id. 126;) and we think the

jury would understand the interrogatory or statement as referring to that knowledge or lack of knowledge on the part of the accused.

We are constrained to believe that the cross-examinations by the judge suggested false tests of sanity to the jury, and that they might well conclude that the judge believed that the defense was without merit unless it was made to appear by direct and positive testimony that the defendant was an imbecile or was the victim of an insane delusion.

As argued by the representatives of the People, the *nisi prius* judge is not a mere umpire presiding over a contest of skill and ingenuity between the respective attorneys. On the contrary, it is his duty to see that justice is done; and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry pursued, it is his duty to interpose, and either by suggestion to counsel or an examination conducted by himself obviate the miscarriage of justice. Under unusual circumstances it may become his duty to call and examine witnesses himself, but where he does this he must not forget the function of the judge and assume that of the advocate. Necessarily, the extent to which the trial judge will participate in the examination of a witness is largely a matter of discretion with him, to be determined from the circumstances of the particular case as they arise; but in a jury trial, where the parties, as here, are represented by able, conscientious and experienced attorneys, it is scarcely possible to conceive circumstances under which the court is, in the performance of his duty, free to enter upon a lengthy cross-examination of witnesses. A suggestion to one or the other of the attorneys of the matter or line of inquiry which the judge desires developed is ordinarily all that is necessary.

The valid objections to the course pursued by the trial judge in this case are several, irrespective of the erroneous

character of the questions which were here propounded. In the first place, counsel is placed in a most embarrassing position where he deems the questions improper, as he is loath to enter into a discussion of their propriety with the judge who has propounded them. Then, where the examination so conducted is lengthy and the objections from one party are many, it is almost impossible for the judge to preserve a judicial attitude. It is difficult for him, however wise, experienced and impartial, to pass on objections to his own questions fairly. Again, where objections are constantly made to the judge's questions and they are constantly overruled, as they are apt to be, the jury, in many cases prone to guide themselves by an intimation of the opinion of the judge, may conclude that he looks with disfavor upon the cause of the party objecting. And as heretofore pointed out by this court in the *Dunn case,* cited below, it is a "task of great delicacy and extreme difficulty" for the presiding judge to conduct the examination of a witness so that no intimation of the examiner's opinion of the witness' credibility will be conveyed to the jury.

The views just expressed find support in the cases of *Dunn* v. *People,* 172 Ill. 582, and *Cunningham* v. *People,* 195 id. 550.

The law guarantees O'Shea a fair and impartial trial. The course pursued by the presiding judge amounted to a denial of this right.

It is unnecessary to consider the other errors assigned.

The judgment of the criminal court of Cook county will be reversed and the cause will be remanded to that court for further proceedings not inconsistent with this opinion.      *Reversed and remanded.*