No. 31,885

THE STATE OF KANSAS, *Appellee*, v. HARVEY RIDGE, *Appellant.*

(40 P. 2d 424)

Opinion filed January 26, 1935.

*Kenneth H. Foust,* *C. J. Peterson* and *S. A. Gard,* all of Iola, for the appellant.

*Roland Boynton,* attorney-general, *Walter T. Griffin,* assistant attorney-general, and *Frank W. Taylor,* county attorney, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The defendant, Harvey Ridge, was convicted of murder in the second degree for the killing of F. C. Johnson, an Allen county farmer and dairyman.

The evidence developed no sharp dispute of important and material fact. It appears that for some ten years Johnson and wife lived on a farm a few miles from Iola. Their family consisted of two sons and two daughters. Three of these were married; and the youngest, a daughter of 15 years, lived with her parents. Johnson appears to have been a jealous and violent man, and may have been cruel to his wife. He was wont to carry a pistol.

The defendant has been a widower for a few years, and roomed and boarded in Iola. About six years ago he became acquainted with Mrs. Johnson, and an intimacy of some sort developed between them. Defendant frequently called upon her; he took her to picture shows; and sometimes she accompanied him to various places. Johnson resented this association; and Mrs. Johnson cautioned defendant that her relationship with him might be dangerous to both of them. She informed defendant that once in a fit of jealousy Johnson had so violently assaulted a man suspected of paying attention to her that he died of his injuries.

About a year before this homicide Johnson met defendant in Iola and the two had a conversation in the presence of a police officer. Johnson accused defendant of paying too much attention to his wife; he told defendant he was breaking up his home; and that he wanted defendant to quit coming to his home. Defendant promised Johnson he would not cause him any more such trouble, and that he would not see Mrs. Johnson any more.

The record tends to show that defendant did not wholly refrain from seeing or visiting Mrs. Johnson thereafter, although apparently they met less frequently. On the day of the fatality, August 28, 1933, perhaps in response to a telephone request from Mrs. Johnson, defendant called at the Johnson home about dusk. That same day he purchased some loaded shells for his revolver. The night was rainy. He and Mrs. Johnson sat down to visit on the front porch. The daughter, Opal Johnson, was reading in bed. Johnson had pretended to start for town, but returned, and came around the house with a pistol in one hand and a knife in the other. Johnson fired two or three times at defendant. One bullet passed through defendant's back and he fell to the ground. Defendant then drew his revolver and fired twice in the direction of Johnson, but it was too dark to see with what result. Defendant then fled in one direction and Mrs. Johnson in another. She testified:

"Opal and I were home by ourselves that night. Mr. Johnson started to town between 7:30 and 8 o'clock at night. It was dark. . . . Mr. Ridge came through the south gate. We sat down on the front steps and I was telling Mr. Ridge about Mr. Johnson giving me a beating about two weeks before that. . . . and I had gotten so I was afraid of him. . . .

"A. Well, the dog barked and I said to Mr. Ridge, 'He might turn around and come back,' and I jumped up right quick and started around the corner of the house and I met someone, and I couldn't tell just for sure who it was, and I look down—I wasn't close enough to him to see who it was—and I looked down and I could see Mr. Johnson's feet, and I could tell by the way he set his feet out that it was him, and he went on around and never said a thing to me, . . . .

"Q. Did Mr. Ridge get up and run? A. No, he never moved.

"Q. He just sat there, did he? A. . . . Mr. Johnson shot twice and he [defendant] fell forward, and I thought he had killed him.

. . . . . . . . . . . . . . . .

"A. He [defendant] just set there until Mr. Johnson shot twice, and I thought he had killed him, because he pitched forward, and that's all I saw.

"Q. Who pitched forward? A. Mr. Ridge, . . . . When he pitched forward, I turned and ran.

. . . . . . . . . . . . . . . .

"A. . . . I just supposed he [Johnson] had killed him. I went out past the milk house and out back of the barn. I thought I could get away. I was so scared I fell many times. I thought once I would hide in the cornfield. I thought Mr. Johnson was after me. I thought Mr. Ridge was killed. I got out of the pasture and was so scared I didn't know where I was going. I was afraid to come out in the light, but I finally go inside of Lowman's house. I got hold of the officers and they came out."

Defendant testified:

"When Mr. Johnson came around the house, he . . . had something in his hand that was glistening; I couldn't say positive it was a knife. After the second shot was fired, I went to the ground in front of the steps. . . . I just sort of doubled up to dodge the blow I thought was coming when I was shot. My gun was in the pocket of my coat at the time Mr. Johnson came around the corner of the house, and the first time I took the gun into my hand was when I was knocked to the ground. Mr. Johnson was standing just a little bit north of where I was. At that time he had gotten me between him and the lights of the city of Iola. He had gotten north of me. After I fell on the ground I fired a couple of shots in quick succession, just as quick as I could get my gun out of my pocket toward where he was standing. He moved; the flash of my gun temporarily blinded me for an instant, and the next time I located where he was, he had fired at me from about the northwest corner of the porch and I fired in the direction which the shot came from. He fired again, and by that time I had raised to my feet and he fired at me. I returned the fire and ran for the fence. I did not know at that time Mr. Johnson had been hit. I got on my feet and ran as soon as Mr. Johnson ceased firing. I went the nearest way and climbed over the fence across the road and went west until I came to the railroad track and went from there to the Austin farm. . . . I asked the parties who lived there to call Doctor Lenski, that I was hurt, and the doctor came and got me. He took me to my rooms in the Northrup building and dressed my injury. . . . The officers returned later. I was in bed when they returned. Doctor Lenski returned with the officers and said, 'Harvey, it is tough; you have killed him.'"

Such was the testimony of the only witnesses to the tragedy.

The jury returned a verdict of guilty in the second degree as charged in the information. Defendant's motion for a new trial was overruled and he was sentenced to—

"Be imprisoned in the Kansas State Prison at Lansing, Kan., at hard labor, until discharged therefrom by due process of law, such sentence, however, not to be for a period of less than ten years from this date."

Defendant appeals, assigning various errors, in the first of which it is contended that the record shows clearly that the whole case was tried by the court on the theory that defendant had no right to defend himself. This complaint is too general for appellate review. If such error inheres in the record, it is not altogether clear that counsel for defendant did not help to induce it. They asked an instruction which contained some rubbish about the "unwritten law," by which, we presume, they meant the notorious figure of speech, "dementia Americana," once used by counsel for the defense in a burst of forensic eloquence in the cause celebre of Harry Thaw in New York a generation ago. Such forensic froth is to be expected

in jury arguments, but it has no place in the precise and serious statements of pertinent law which should characterize instructions to a jury.

. Defendant also complains of the court's failure to give a clear-cut and definite instruction on the law of self-defense, such as an impartial interpretation of the facts in evidence would appear to require. The instruction asked by defendant and refused read:

" . . . If you find from the evidence that Curt Johnson, on the night of August 28, 1933, left his home and then returned home with a revolver and a knife, or either, and that he returned believing that the defendant Ridge was there at his home, and if you believe that he returned and attempted to take the life of the defendant Ridge, you are then instructed that, if in your opinion, the said defendant Ridge was in immediate danger of losing his life, that then the defendant Ridge would, as a matter of law, be permitted to defend himself, even to the extent of killing the said Curt Johnson, if that was necessary under the existing circumstances, for the protection of the said defendant, Harvey Ridge."

What the trial court did instruct on this phase of the case reads:

"11. Gentlemen of the jury, the defendant in this case has interposed the law of self-defense, or what is denominated in law as 'justifiable homicide,' as hereinbefore defined. In this connection you are instructed that a party who is unlawfully attacked by another may stand his ground and use such force as at the time reasonably appears to him to be necessary. He is justified in acting upon the facts as they appear to him, and is not to be judged by the facts as they actually are or appear to others.

"12. The general rule is that the right of self-defense does not imply the right of attack, and one who provokes or brings on an affray in which he kills or inflicts bodily injury on his adversary, or who produces or brings about the occasion which makes it necessary for him to commit homicide or inflict the injury, cannot justify his act on the plea of self-defense.

"13. In other words, gentlemen of the jury, self-defense is a defensive act, and not an offensive one, and one who, by his own acts, brings on a conflict, is not acting defensively, but is acting unlawfully, and he cannot escape the consequences of his wrong upon the plea of self-defense or apparent danger."

These instructions are not erroneous as abstract legal propositions, but they are too general, and Nos. 12 and 13 were not pertinent. There was no evidence which tended to show that defendant provoked the affray in which he killed Johnson that dark and rainy night. Defendant did not bring on any conflict with Johnson on the occasion of the homicide. The fact that defendant had been visiting or consorting with Johnson's wife, without Johnson's permission or despite his disapproval, was not in legal contemplation the provoking of an affray or the bringing on of a conflict of violence

with Johnson. The court should have plainly told the jury that any forbidden visits of defendant to the Johnson home, or conversations between defendant and Mrs. Johnson, or any other suspected intimacies of defendant and Mrs. Johnson, would not justify Johnson in taking the law into his own hands nor deprive defendant of the right of self-defense. The law affords various remedies against a wrongdoer who interferes with his marital happiness. He may sue him for alienation of his wife's affections; he may obtain an injunction to prevent him from coming upon his premises; he may prosecute him for seduction or for other breaches of the criminal law which deal with sexual irregularities with a married woman. And while the law will not condemn the suspicious husband for giving his wife a single opportunity to indulge her adulterous disposition (*Harmon v. Harmon,* 111 Kan. 786, 791, 208 Pac. 647) such a course is only countenanced to obtain evidence of her infidelity, and gives no shadow of excuse for shooting her paramour. In discussing this phase of the law, this court has no intention of placing a sinister interpretation on the relationship of defendant and Mrs. Johnson. That relationship, curious as it was, may have had no taint of immorality. Mrs. Johnson may have been an ignorant person who did not know enough to complain of Johnson's tyrannies or brutalities to the public authorities or to a private lawyer, and may have innocently sought such counsel as defendant might give her. There was testimony that deceased had beaten his wife about two weeks before the homicide, and had threatened to hang her in the barn in such a way that it would appear to be a case of suicide.

Another error urged relates to misconduct of the judge in the course of the trial and in the presence of the jury. This criticism is directed to the judge's remarks and insinuations in the course of the examination of the state's chief witness, Mrs. Johnson. The record reads (Mrs. Johnson testifying):

"We went around and sat down on the front steps; we sat down there. Mr. Ridge had on an overcoat. . . . I had on a pair of rubber boots and a coat thrown around me.

. . . . . . . . . . . .

"By THE COURT: Wait a minute. You just had on a pair of rubber boots and a coat? A. Well, I had my clothes on.

"By THE COURT: You didn't say that. A. Sure, I did.

"By THE COURT: You had your clothes on? A. Sure I did.

. . . . . . . . . . . .

"By THE COURT: Well, you just stopped on the coat and rubber boots, and I wondered if that was all you had on."

Later the presiding judge took up the examination of this witness *in extenso:*

"By THE COURT: . . . You met up with the defendant, Ridge, several years previous to August 28th, 1932? A. Yes.

"Q. Your husband finally got on to it? A. Yes, sir.

"Q. And he cautioned you to quit it, didn't he? A. Yes, sir.

"Q. Then why didn't you? A. Well, there was trouble between him and I.

"Q. No, no, not between you and your husband. I am asking you about the relations between you and Ridge. A. Well, I just didn't.

. . . . . . . . . . . . . . .

"Q. The secret meetings between you and Ridge were the ones that brought about the disagreement between you and Johnson, weren't they? A. Not altogether, no.

"Q. Not altogether, but it superinduced it, aided it? A. No.

. . . . . . . . . . . . . .

"Q. Well, then, why didn't you obey? If you would have listened to what your husband said, this trial wouldn't now be in progress would it, Mrs. Johnson? A. No. I don't think so.

"By THE COURT: No, you know it wouldn't. That's all."

*"Recross-examination:*

[COUNSEL FOR DEFENDANT]: "Q. Now, Mrs. Johnson, the court asked you a question of whether this matter between you and Ridge caused all the trouble and you said no, there were other things. Now I will ask you to tell the jury what the other things were.

. . . . . . . . . . . . . .

"By THE COURT: You are not going to go into that, because she is the one who volunteered the information, and I don't care what it is, but you gentlemen brought it out.

[COUNSEL FOR DEFENDANT]: "No, if the court please, she testified to that in answer to your question.

"By THE COURT: She testified she had been married to this man, F. C. Johnson, and was his lawfully wedded wife for thirty-one years, and here she was carrying on a secret liaison, secret meetings, adulterous in character, I expect, wasn't it? A. No.

"By THE COURT: It wasn't? A. No.

"By THE COURT: And this has been going on for four (4) or five (5) years, that long, anyway, wasn't it? A. Yes, sir.

"By THE COURT: And nothing out of place—just—you know. Now, she said that was one of the causes that led to the disagreement between her and her husband. Now, then, any other causes wouldn't aid it any, or explain it away.

[COUNSEL FOR DEFENDANT]: "Now, if the court please, I object to these remarks of the court because the court himself was the one that asked this witness if this trouble with Ridge wasn't the only trouble."

The record contains more of such colloquy between court and counsel which it is needless to reproduce. While it is true that a trial judge need not refrain from asking questions of a witness to elucidate and clarify material facts which the examining counsel have not sufficiently developed for the jury to grasp (*State v. Keehn,* 85 Kan. 765, 118 Pac. 851; *State v. Miller,* 127 Kan. 487, 274 Pac. 245), it is not proper for him to take the examination out of the hands of counsel, nor to assume a partisan attitude; and certainly it went altogether beyond the bounds of judicial propriety to insinuate in the presence of the jury that this witness had been involved in an adulterous liaison with the defendant; and likewise improper, when the witness had denied such a relationship with defendant, to damn her denial with the observation: "And this had been going on for four or five years—and nothing out of place—just—you know." Such a course on the part of the presiding judge could only have the effect of discrediting the testimony of the witness in the eyes of the jury—leading them to believe defendant was an adulterous Lothario who ought to be in the penitentiary on general principles—regardless of the possibility that he had to shoot his assailant to save his own life or avoid further bodily harm than he had already suffered at the hands of Johnson.

No cases of this or any other court of last resort are cited which hold that the matters of record abridged as above do not constitute prejudicial error. In *State v. Marek,* 129 Kan. 830, 284 Pac. 424, which was a murder case, it was held that the remarks of the trial judge which "probably affected the credibility of a witness in the minds of the jurors" were improper and prejudicial. That opinion cites earlier cases of this court to the same effect. In *O'Shea v. The People,* 218 Ill. 352, 359, 360, the discretion a trial judge must invariably exercise when he assumes to question a witness in a criminal case was thus stated:

"Where the trial judge in a criminal case deems it necessary to cross-examine witnesses in order to prevent a miscarriage of justice, he must exercise great care to prevent giving the jury the impression that he is biased against the accused, and he must not forget the function of a judge and assume that of an advocate." (Syl. ¶ 4.)

In the opinion it was said:

"As argued by the representatives of the people, the *nisi prius* judge is not a mere umpire presiding over a contest of skill and ingenuity between the respective attorneys. On the contrary, it is his duty to see that justice is

done; and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry pursued, it is his duty to interpose, and either by suggestion to counsel or an examination conducted by himself, obviate the miscarriage of justice. Under unusual circumstances it may become his duty to call and examine witnesses himself, but where he does this he must not forget the function of the judge and assume that of the advocate. Necessarily, the extent to which the trial judge will participate in the examination of a witness is largely a matter of discretion with him, to be determined from the circumstances of the particular case as they arise; but in a jury trial, where the parties, as here, are represented by able, conscientious and experienced attorneys, it is scarcely possible to conceive circumstances under which the court is, in the performance of his duty, free to enter upon a lengthy cross-examination of witnesses. A suggestion to one or the other of the attorneys of the matter or line of inquiry which the judge desires developed is ordinarily all that is necessary.

"The valid objections to the course pursued by the trial judge in this case are several, irrespective of the erroneous character of the questions which were here propounded. In the first place, counsel is placed in a most embarrassing position where he deems the questions improper, as he is loath to enter into a discussion of their propriety with the judge who has propounded them. Then, where the examination so conducted is lengthy and the objections from one party are many, it is almost impossible for the judge to preserve a judicial attitude. It is difficult for him, however wise, experienced and impartial, to pass on objections to his own questions fairly. Again, where objections are constantly made to the judge's questions and they are constantly overruled, as they are apt to be, the jury, in many cases prone to guide themselves by an intimation of the opinion of the judge, may conclude that he looks with disfavor upon the cause of the party objecting." (p. 359.)

See, also, *State v. Davis*, 136 N. C. 568; *Davis v. Dregne*, 120 Wis. 63; Thompson on Trials, 2d ed., § 219.

Another error urged relates to the admission of testimony of a witness that she overheard a telephone conversation between Mrs. Johnson and some unidentified man. Mrs. Lowman testifying:

"Q. During the summer, and before August 28th, when Mr. Johnson was killed, did you hear any conversation Mrs. Johnson had with someone that would call her up, or that she would call up? A. Yes, sir; we did.

"Q. Was that someone a man? A. Yes, sir.

[COUNSEL FOR DEFENDANT]: "Now, if the court please, now let's be fair. This is getting a pretty long ways off. She says a man. I don't know about this. How many men might have talked to Mrs. Johnson? I don't know anything about that. Let's get some connection here.

"BY THE COURT: Yes, let's connect it up with some individual.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Do you know, Mrs. Lowman, who it was talking there on the other end of the line with her? A. No, I don't.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. You don't know whether it was Mr. Ridge talking to her or not? A. No, sir.

"Q. How often would this conversation take place?

[COUNSEL FOR DEFENDANT]: "I object to it as immaterial, not tending to prove any issue in this case.

"BY THE COURT: Well, let him do some fishing. He is trying to find out if he can.

[COUNSEL FOR DEFENDANT]: "Well, if the court please, she says she doesn't know anything about it. She doesn't know that it was Ridge, and it doesn't make any difference how 'many other men she might have talked to.

"BY THE COURT: I know; overruled. Let's go ahead and see what he can find out.

[COUNSEL FOR DEFENDANT]: "We don't know how many were on the line talking at the same time.

"BY THE COURT: Well, let's give him a chance. Maybe he can connect it up.

"Q. It would be Mrs. Johnson talking to this man, would it? A. Yes, sir."

Eventually the court instructed the jury to disregard this testimony *"for the reason the state has failed to connect it up with the defendant."*

It is difficult to measure the extent of the prejudice this line of testimony may have created in the minds of the jury. It is clear, we think, that the court's final ruling that the jury should disregard it was insufficient to dissipate that prejudice, because of the court's expressed reason for their disregarding it, solely because the state failed to "connect it up with the defendant." What would the average juryman conclude? That doubtless defendant was the man on the telephone, although the eavesdropper could not swear to the fact.

Some other matters are complained of, but as this cause will have to be retried and they are not likely to arise again they will not require discussion.

One other error is urged which was not pressed on the trial court's attention, but which is now conceded by the state. It relates to the imposition of an indeterminate sentence, whereas the statute requires the sentence in a murder case to be definite and specific. (R. S. 62-1521; *State v. Deming,* 79 Kan. 526, 100 Pac. 285, syl. ¶ 2.)

The judgment is reversed, and the cause remanded for a new trial.