## Richmond

HOWARD DELP V. COMMONWEALTH OF VIRGINIA.

January 9, 1939.

Record No. 1709.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*S. B. Campbell* and *G. P. Young,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

The accused was tried upon an indictment charging him with the murder of Posey C. Martin. The jury found the accused guilty of murder in the first degree and fixed his punishment at death. This writ of error brings under re-

view the judgment of the court sentencing him to be electrocuted.

On the 21st day of February, 1935, the accused, Howard Delp, was arrested in the town of Galax, upon a charge of drunkenness. The arrest was made by Posey C. Martin, chief of police, at approximately six o'clock P. M. At that time the companion of accused, one Dowe Leonard, was also arrested and later both of them were incarcerated in the town jail which is situated on the second floor of the municipal building.

A short time after Delp and Leonard were placed in jail, friends of Leonard secured his release upon bail. However, just prior to the release of Leonard, Delp and Leonard became engaged in a "fuss." Delp produced a knife and made the statement to Leonard that he was going out of the jail first. As it was thought necessary that the bond of Leonard be taken by Martin, he was called to the jail from a near-by hotel for that purpose. When Martin entered the corridor of the jail Delp was standing at the cell door, which is a grated door, and as Martin opened the door, Delp attempted to rush by him. Martin attempted to push Delp back into the cell and a scuffle ensued. Bystanders went to the assistance of Martin, but in the melee which ensued, Delp stabbed Martin in the neck, severing the jugular vein and the carotid artery, from which wounds Martin immediately died.

After stabbing Martin, as Delp sought to escape, he was met in the hall by E. F. Dotson, a police officer who had assisted Martin in arresting Delp. When Dotson made an effort to restrain Delp he was cut in the face and head by Delp, and as a result of his wounds, was confined in a hospital eleven days. After cutting Dotson, Delp successfully resisted the efforts of seven or eight men to hold him, rushed down the steps, struck at a boy on the steps, broke the glass in the street door and disappeared in the darkness.

After his escape from the jail, Delp went to the home of a relative. Questioned as to the blood upon his person, he stated that he had a difficulty with a man and had struck at him but missed him and cut himself on a barbed wire. Upon

the request of Delp that he be taken to the town of Hillsville, the relative and Delp got in an automobile and started for the town. Just as they approached Hillsville, the car was stopped by an officer who informed them he was looking for Delp. Delp leaped from the car and escaped. After a three day search by the officers, assisted by a number of citizens, Delp was finally arrested near North-Wilksboro, North Carolina. Due to the intense feeling against him Delp was placed in the jail at Wytheville. When first arrested he talked freely with the officers about the killing, where he had been and his efforts to avoid capture.

At the March term of the circuit court an indictment was found against Delp and his trial was set for the 25th day of March. Upon his arraignment, counsel appointed by the court to defend him, made a motion that Delp be committed to one of the State hospitals for the insane, for observation as to his sanity, and, in support of the motion, introduced as witnesses Doctor George A. Wright, superintendent of the Southwestern State Hospital at Marion, Virginia, and his first assistant, Doctor A. D. Hutton. After stating that he was acquainted with the family and personal history of Delp, Doctor Wright testified as follows:

"Q. Doctor, will you tell the judge the extent of your examination, and describe to him the extent of your examination, so that he may know the extent to which you went, — the effort you made to ascertain this man's condition?

"A. I think it is proper to state in the outset that I am not fully satisfied, through failure to get this boy's co-operation. We made two intensive efforts to bring out his true condition. The boy is evasive. Whether this was purposely so or not, or whether it is due to a possible mental condition, I couldn't say. That is the point in doubt in my mind. We made a complete physical examination of this boy, stripped him and examined him thoroughly, and we made what we call a neurological examination. That is an examination of the nervous system. And then we attempted two separate mental investigations. The boy does not talk. It is impossible to tell just what is in a person's mind unless

you can listen to some of his conversation, or be able to bring out certain points. The boy, if he had nothing at stake; if there was no possibility of his malingering; I do not think we would hesitate to express an opinion as to his mental condition. We took into consideration the gravity of the charge, and the possibility of his attempting to fake, — yet there were points, a number of important points brought out throughout the course of this attempted mental investigation which were very suggestive of mental involvement. For instance, he refused to answer the majority of questions he was asked, and he would stare in space. He was apparently apprehensive, and was looking around to see every one that came in, as though something was after him, and as I say, he was evasive and would not answer questions, but the point I started to mention was that he at various times had outbursts of silly laughter, which I believe it would take some person of more sense than I think he has to improvise and carry through. Silly laughter and silly conversation are very suggestive of a form of mental trouble, or dementia praecox. We see that so frequently, and we were impressed with this boy as being so typical of that form of insanity that it was very suspicious, and for that reason, from our point of view, we could not express an opinion, and in justice to everybody concerned, we feel that the boy should be studied further. I couldn't say that the boy is insane. I would not assume the responsibility at the present time of saying that he is sane. I do not know, but if we had him in the institution, and he had nothing at stake, I would not hesitate to declare him insane."

By the court: "The indications from your examination are dementia praecox?"

"A. No, sir, we have not determined that he is really insane."

Evidence of Doctor A. D. Hutton was of a similar nature.

At the conclusion of this evidence the court overruled the motion to commit the accused for observation and sustained the motion of the attorney for the Commonwealth, that a jury be impaneled to try only the question of the sanity of

the accused. On this question a number of witnesses were introduced, both by the accused and the Commonwealth. The chief reliance of counsel for the accused was upon the evidence of the medical experts. No evidence of any acts committed by the accused prior to the killing, indicating that accused was insane, was introduced. On the other hand, all of the witnesses for the Commonwealth testified that the life and conduct of the accused indicated that he was sane.

Upon the conclusion of the evidence, the jury returned this verdict: "We, the jury, find the defendant, Howard Delp, sane at this time." Following this verdict, the accused was tried upon the indictment charging him with murder. The evidence of the Commonwealth conclusively shows that the killing of Martin was wilful, deliberate and premeditated. The only defense interposed by counsel for accused was that of insanity.

It is assigned as error: (1) that the court erred in refusing to commit the accused for observation; (2) that the court erred in impaneling a jury to inquire into the sanity of the accused.

These assignments require a construction of sections 4908 and 4909 of the Code. Section 4908 is merely declaratory of the common law and reads as follows:

"No person shall, while he is insane, be tried for a criminal offense."

Section 4909, as amended by Acts 1930, ch. 377, provides for the determination of the question of the sanity of a person charged with crime, and so far as is pertinent, is as follows:

"If, prior to the time for trial of any person charged with crime, either the court or attorney for the Commonwealth has reason to believe that such person is in such mental condition that his confinement in a hospital for the insane or a colony for the feeble-minded is necessary for proper care and observation, the said court or the judge thereof may, after hearing evidence on the subject, commit such person to any State hospital for the insane best adapted to meet the needs of the case. * * *

"If a court, in which a person is held for trial, see reasonable ground to doubt his sanity or mentality at the time at which, but for such a doubt, he would be tried, it shall suspend the trial and proceed as prescribed in the foregoing paragraph or until a jury inquires into the fact as to the sanity or mentality of such person. Such jury shall be impaneled at its bar. * * *

"If the jury or commission find the accused to be sane at the time of their verdict, they shall make no other inquiry, and the trial in chief shall proceed. If the jury find that he is insane or feeble-minded at the time of their verdict, they shall further inquire whether or not he was insane or feeble-minded at the time of the alleged offense; * * *."

In the brief of counsel for the accused it is frankly admitted that it is discretionary with the trial court whether or not it will commit a person charged with crime to a hospital for observation. However, it is earnestly contended that under the facts of the instant case it was an abuse of judicial discretion to refuse to commit the accused as requested.

Since the decision of this court in *Wood* v. *Commonwealth*, 146 Va. 296, 135 S. E. 895, 898, the question whether the commitment of an accused to a hospital for observation is mandatory or discretionary, is no longer a debatable one. In that case Judge West disposes of a similar issue in this language:

"It is clear that this section places no obligation upon the court to appoint a commission except where the court or attorney for the Commonwealth has reason to believe that the person to be tried is in such mental condition that his confinement in a hospital for the insane, or colony for the feeble-minded, for proper care and observation is necessary to attain the ends of justice. They observed the accused in the court and heard all the evidence offered on the question of his mentality, but neither the court nor the attorney for the Commonwealth entertained such belief.

"After hearing the evidence, the court may, in its discretion, commit such person to the department for the

criminal insane, at the proper hospital, pending the determination of his mental condition. While this court has the power to review the action of the trial court in such cases, it will not disturb its ruling unless it plainly appears that such discretion has been abused. No expert testimony was introduced to show that the accused was insane or feeble-minded, and his brother was the only witness to testify on that subject, although seven other witnesses testified in his favor. We find nothing in the record to warrant the conclusion that the court has abused its discretion in the premises. The accused was not prejudiced by the court's refusal to appoint the commisssion inasmuch as his mental condition at the time of the commission of the offense was put in issue by his plea of not guilty, and gave him an opportunity to prove his mental condition. The verdict of guilty is a finding that the accused was sane at the time the offense was committed."

It is to be observed that the opinion also answers the contention of the Commonwealth in the case at bar that no appeal lies from the action of the court in refusing a commitment.

The question then arises, was there an abuse of the discretion vested in the trial court by the statute? In our opinion there was not. As shown by the testimony of the medical experts, *supra,* they were unable to state whether the accused was sane or insane.

In *Dejarnette's Case (Dejarnette v. Commonwealth)*, 75 Va. 867, 881, it was observed that insanity is easily feigned and hard to be disproved. In the situation confronting the trial court, *viz.,* the commission of an allegedly brutal murder and the unsatisfactory evidence that the accused was insane, the trial court did, in our opinion, the proper thing in submitting the question to a jury for determination.

It is further assigned as error that the court erred in refusing to strike out the evidence of the Commonwealth introduced upon the trial of the insanity issue. The evidence in many particulars was conflicting and the trial

court was correct in its holding that the issue should be determined by the jury.

The remaining assignments of error challenge the action of the court in giving and refusing instructions in both of the jury trials; in refusing to set aside the verdict of the jury finding the accused sane; in requiring the accused to go to trial on the murder indictment; in refusing to set aside the verdict of the jury, finding the accused guilty of murder in the first degree; in refusing to stay the pronouncement of judgment and because of the insanity of the accused.

To enter upon a *seriatim* discussion of the foregoing assignments of error would only tend to becloud the main question herein involved. There is no doubt that if the accused was sane at the time of the commission of the murder or at the time he was put upon his trial, then justice has been meted out to him.

Two impartial juries have passed upon the question of the sanity of the accused. In one instance he was found sane at the time of the commission of the crime; in the other instance he was found sane at the time of his trial upon the indictment. He has been defended by a former president of the Virginia State Bar Association, in a trial presided over by an impartial judge, and a verdict of guilty of murder in the first degree has been returned against him by an impartial jury upon evidence in which there was no conflict. In a painstaking examination of the record we have been unable to discover any error committed by the trial court.

Our conclusion, therefore, is that the judgment must be affirmed.

*Affirmed.*