# Richmond

## CHARLES HOLOBER v. COMMONWEALTH OF VIRGINIA.

January 15, 1951.

Record No. 3758.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*T. Brooke Howard, Bernard Margolius* and *Bernard Cohen,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Henry T. Wickham, Assistant Attorney General,* for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

This writ of error brings under review the proceedings in the trial of Charles Holober, who was convicted by a jury of the murder of his wife and his punishment fixed at death. There was no question that the accused killed his wife, and his only ground of defense was insanity. The trial court approved the verdict and judgment was entered accordingly.

In his brief the defendant assigned three grounds of error. He claimed that the verdict was contrary to the law and the evidence, in that the evidence conclusively showed that he was insane; that the trial court erred in

giving to the jury two 'certain instructions requested by the Commonwealth; and lastly that he was denied a fair and impartial trial by reason of the conduct and remarks of the trial judge during the proceedings before the jury.

The first ground was not insisted on in the argument at the bar of this court. Eighteen instructions were given,—ten at the request of the Commonwealth and eight for the accused,—fairly covering the issues of the case. In the trial court counsel for the defendant expressly stated that he had no objection to any of the Commonwealth's instructions. Objection was made here for the first time.

In view of the foregoing, we shall state only such facts as are necessary to show the background for the last assignment of error. In doing so, we shall refrain from any expression, or even intimation, of our opinion with respect to the character and nature of the evidence on behalf of the accused.

On February 25, 1949, the wife of the defendant was reported as missing to the Missing Persons Bureau of the Metropolitan Police Department, Washington, D. C. On the next day, Holober, at the request of the police, came to a police station in Washington. While there he received a telephone call from an attorney. After his telephone conversation, he refused to answer any questions about his wife until his attorney arrived. The attorney, upon his arrival, first refused to allow the defendant to answer any questions about his wife. However, after a short conference, the attorney informed the police that Holober would co-operate with them in every respect. Holober then told the police that he borrowed his sister's car on February 25, 1949, and at three o'clock on the afternoon of that day, took his wife for a drive. He told her that he desired to show her a place in Virginia where he had been visiting. He and his wife, with their ten-months old baby, drove to Green Forest, an abandoned nudist colony in Fairfax county, Virginia. He said that, upon their arrival, they had a dispute and she ran away from him, taking the baby, and he had not seen or heard of either of them since.

At the request of the police, Holober and several police officers drove to Green Forest, and Holober there showed them the spot where he said he had last seen his wife. He stated that his car had gotten stuck in the mud; that he and his wife got into an argument about their domestic relations; and that she jumped out of the car and ran up the road with their baby in her arms. He followed her about one hundred feet and then returned to the automobile. The automobile was mired so deep in the mud he could not move it, so he spent the night in the car, and returned to Washington the following day.

On Sunday, February 27, 1949, members of the Washington police force, accompanied by two officers of the Fairfax county police department and a group of Boy Scouts, went to Green Forest. They searched the grounds and area around the abandoned nudist colony. Late in the afternoon they discovered the bodies of the defendant's wife and infant child buried in a shallow grave about twenty-seven feet from a building located on the premises. Mrs. Holober's underpants were found dropped around her ankles and her ring and jewelry had been removed from her body. She had been shot in the head and through the heart. The child apparently had been buried alive and died of suffocation.

About one o'clock a. m. on February 28, 1949, police officers from Fairfax county interviewed Holober at a police station in Washington, where he was being detained for further questioning. At first he was in doubt as to whether the bodies had been found; but when it was explained how and where they had been found, as well as the pick and shovel which had been used to dig the grave, he voluntarily confessed the circumstances of the crime, and commended the police on doing a good job. He said that on the trip with his wife from Washington to Fairfax county, Mrs. Holober requested him to stop the car for her to get out to urinate. It then occurred to him that this afforded him a good reason and method to get her out of the car and then kill her. He told the officers he had thought that he had committed the perfect crime.

Holober thereafter accompanied the police to his mother's home in Washington, where he resided. He there produced the gun he had used to kill his wife, and the ring, wrist watch and other jewelry which she wore at the time of her death. The group then returned to police headquarters in Washington, and he made a voluntary statement which was put in writing. The statement was read to him, received his approval, and was signed by him. Omitting such portion as related to the death of the child, the confession reads as follows:

"On Wednesday night, February 23, 1949, about 9:30 p. m. I was visiting at my wife's home at 931 New York Avenue, N. W., Washington, D. C., at which time I decided to do away with my wife. The reason that I decided to do away with her was that she failed to live up to her part of the agreement about our marriage.

"The following day, Thursday, February 24, 1949, at about noon, I asked my sister if I could borrow her car to take my wife and child for a ride. After my sister agreed to let me have her car, I then taken a shovel and mattock from the basement and put them in the trunk of the car. I also put my pistol in the pocket of my leather jacket. I then picked my wife and child up at her house at about 1:45 p. m. and drove out into Virginia.

"I drove my wife and child out to Green Forest as I knew that area and that was the place I decided to dispose of them at. We arrived at this place about 2:45 p. m. About six or seven minutes after we arrived at Green Forest my wife got out of the car to urinate and had her back toward me and I shot her in the back of the head. After I shot, she fell over on her right side and the only thing she said was 'Charlie' and she kept on breathing and after about two minutes I shot her again in the region of her heart. After I shot her in the region of the heart, blood came from her mouth and nose and she apparently died in about two minutes. I then began digging a trench to bury my wife in, which taken me about an hour. I then drug my wife's body over to the trench and placed her in it.

After I had finished covering my wife in the trench it was about 5:45 p. m. and I started back to Washington.

"On the way out of the driveway I became stuck and I attempted to dig the car free with the shovel and mattock but was unsuccessful. I stayed in the car that night and the following morning I hid the shovel and mattock in the bushes opposite the driveway and hitchhiked to Falls Church, Virginia, and there I caught a bus and returned to my home.

"My brother-in-law and I returned that same day and got the car."

Further evidence with respect to the death of the child, obtained from conversations with Holober, was substantially as follows:

Holober said that after he killed his wife it took him about two hours to dig a shallow grave, because the ground was hard. During that period his baby, in the back seat of his car, was crying part of the time and asleep the other part; that after placing his wife in the grave, he put the baby on the mother's breast, took his pistol, tried to fire at the baby, but the gun did not discharge; and he then buried the baby and the mother, covering them with about six inches of dirt. When he heard the baby crying, he pressed down the earth on the grave. Asked why he didn't strike the baby with the shovel and kill it, he replied: "Oh! no, I wouldn't do that."

It appeared from the evidence that the defendant's wife had been a waitress, and the defendant said he undertook to educate her to become a "white collar" worker. During their association she became pregnant by him, and he was persuaded to marry her to give the child a name, upon the condition that he would support the child, but would not live with her. He thereafter paid $5 a week towards the child's support, and continued to live with his family. Mrs. Holober retained her job and lived with her family. Upon complaint of his wife, he was later ordered by the Juvenile and Domestic Relations Court in Washington, D. C., to increase his payments for the child to $6 a week. This he

did, obtaining part of the money from his family, because he was unable to keep himself steadily employed. However, Holober continued to see his wife and have sexual relations with her, and about three weeks before the commission of the crime, he learned that his wife was pregnant again. His wife, under the circumstances, insisted that she would move into the home of Holober's mother and live with him. He thought this was a breach of his agreement with his wife, became very much upset at the prospect which confronted him, and gave this as his reason for desiring to be rid of his wife and child. He said he knew that he had committed a grave wrong, and he hoped he would be given life imprisonment instead of death.

The defendant introduced the testimony of his mother, brother and sister to show that he had been of unsound mind since his childhood. They said that he had been a peculiar youth, would not associate with people, never had any friends, couldn't keep a job, dressed in an odd manner, had peculiar eating habits, and would stay in his room for two days without coming out for food. His sister said he lived in a dream world, and that his unhappy state of mind gradually got worse. She had heard him say that "there was a black cloud hanging over his head." He didn't use the telephone and would not answer calls if he could avoid it. He left high school without cause before he finished, and seemed to have no control over the direction his impulses led him. The mother of the defendant said that recognizing the fact that he was not well, she had vainly tried to get him to see a doctor time and time again; that he would ride around on street cars for hours without any purpose; that he would sit in the park because he felt that he just had to; and that during the three-week period before the crime, he was very blue and wanted to be left alone. After the crime, he told her that when his wife told him she was pregnant again, and was going to raise her children in his mother's house, he just "had to do it," that is, commit the crime.

It further appeared that the defendant had attempted

to commit suicide when he was sixteen years of age, and only escaped by an accidental happening. In 1942, upon a physical examination for induction into the armed services, he was rejected and disqualified for military service by reason of "Defective vision and pre-psychotic personality."

In support of the defense of insanity, four witnesses, a psychologist, a medical doctor, and two psychiatrists, testified. Each of these witnesses examined the defendant, obtained from him his story of the crime, and consulted with members of his family as to his life's history.

Dr. Daniel. Gabriel, a medical doctor, connected for a period of time in 1949, with the Southwestern State Hospital at Marion, Virginia, when Holober was commited for observation as to his mental condition, testified that defendant's behavior was not normal; that he showed no remorse or regret whatever for his acts, but grinned most of the time; and that in his opinion he was not sane. He thought that a patient with Holober's abnormal tendencies could, by suffering from a disappointment or frustration, become insane.

Dr. Margaret Ives, a psychologist connected with established hospitals, a teacher of psychology at George Washington University, and an author of books on that subject, said that the defendant was definitely a schizophrenic of the paranoid type, a more modern term for dementia praecox. She explained that schizophrenia meant a split mind, one part of the mind thinking along one line and the other part a different line. She was of the opinion that he was insane, and that his mind was incapable of functioning normally. She thought that with his type of insanity, he was capable of planning and committing a murder.

Dr. Frank S. Caprio, a psychiatrist since 1935, engaged in private practice and connected with several government hospitals, and the author of several books on the subject of psychiatry, examined the defendant on eight occasions. He also interviewed members of Holober's family to discover any discrepancy in the statements made by the accused. He was of opinion that Holober was of unsound mind prior to the commission of the crime, at the time of the

commission, and was still insane at the time of the trial. His diagnosis was that Holober was suffering from schizophrenia of a paranoid type which made him not responsible for his actions.

Dr. Benjamin Karpman, the next witness, qualified as an expert psychiatrist with thirty years experience. He is the author of numerous books and articles on criminal psychiatry, and has been a professor at Harvard Medical School for twenty years, teaching post-graduate work in the above subject. He examined the defendant on a number of occasions, and was of the definite opinion that he was of unsound mind, both at the time of the commission of the offense and at the time of the trial. He thought the frustration which the defendant encountered, because of the problems presented by his wife, created in his mind the idea that he had to get rid of her, and there was nothing he thought about except the accomplishment of the act.

In rebuttal the Commonwealth called three qualified psychiatrists as witnesses.

Dr. F. S. Chance, who was attached to the Southwestern State Hospital, Marion, Virginia, during the period when the defendant was committed there for observation as to his mental condition, said that it was very difficult to diagnose the condition of Holober. He thought he had a schizoid personality, which was very close to the line which separates the sane from the insane; that he showed no emotional regret in connection with the crime; and acted as a mechanical man. He admitted that there was a possibility the crime could have been brought on by an impulse over which the defendant had no control. He was of the opinion, however, that defendant met the qualifications of sanity during the time he knew him and was sane at the time of the trial.

Dr. Joseph R. Blalock, superintendent of the Southwestern State Hospital, examined the defendant upon his arrival and on at least two other occasions. He classified the defendant as an egocentric with a psychopathic personality, that is, with a maladjusted personality. He was of opinion

that Holober was sane at the time of the commission of the offense, and sane when he saw him shortly prior to the trial.

Dr. Grenville L. Jones, superintendent of the Eastern State Hospital, Williamsburg, Virginia, testified that he examined the defendant on December 9, 1949, about one month before the trial and ten months after the crime, and had read the record of the Southwestern State Hospital relative to him. As a result of his personal conferences, the above mentioned record and the circumstances surrounding the crime, he came to the conclusion that the defendant was sane and competent; although psychopathic. He admitted that there was evidence that defendant had broken with reality, which might have placed him over the line into a state of insanity. When asked if Holober had been motivated by an impulse over which he had no control, he replied: "I don't know that I can answer that. I don't think that the impulse was one over which he had no control. I think it was an impulse that he chose not to control. I can only say what I think, and I don't think so, but I couldn't be positive about it, no."

■ It is firmly established in the jurisprudence of this State that: "When the *corpus delicti* has been established and proof adduced that the accused committed the act, it is not sufficient for the accused to raise a reasonable doubt as to his sanity; he must go one step further and prove to the satisfaction of the jury that he was insane at the time of the commission of the act." *Wessells* v. *Commonwealth*, 164 Va. 664, 673, 180 S. E. 419.

In *Baccigalupo* v. *Commonwealth*, 33 Gratt. (74 Va.) 807, 817, 36 Am. Rep. 795, quoting from *Boswell's Case*, 20 Gratt. (61 Va.) 860, 868, the following instruction was approved:

"The jury are instructed that every man is presumed to be sane, and to possess a sufficient degree of reason to be responsible for his crimes until the contrary is proved to the satisfaction of the jury."

In *Dejarnette* v. *Commonwealth*, 75 Va. 867, 881, we

held that where insanity is relied on as a defense, it must be proved to the satisfaction of the jury, and it is not necessary that the jury shall be satisfied beyond all reasonable doubt.

To the same effect see *Thurman* v. *Commonwealth*, 107 Va. 912, 916, 60 S. E. 99, and *Maxwell* v. *Commonwealth*, 165 Va. 860, 865, 183 S. E. 452.

The testimony of the psychiatrists with respect to the sanity of the defendant was in conflict. Testimony concerning the mental condition of a person, by the very nature of the subject, is necessarily speculative to a certain degree. It cannot consider every possible condition of the mind. Because insanity is easily feigned and hard to be disproved, public safety requires that it be established by satisfactory evidence. *Dejarnette* v. *Commonwealth, supra,* page 881.

Here, the issue, sharply in dispute, distinctly presented a question for determination by a jury. *Delp* v. *Commonwealth*, 172 Va. 564, 200 S. E. 594. It was, in fact, the principal issue upon the trial, and the major question presented to the jury. On that issue the jury should not have been influenced in any manner by the words and conduct of the trial judge, directly or indirectly, explicitly or by innuendo.

During the course of the direct examination of Dr. Caprio, he was asked whether a person who is schizophrenic, so far as he was concerned, could be legally sane, he replied that he could. The court then remarked, "Maybe Dr. Caprio's idea of legal insanity and the court's idea might be two different things." Again, after an objection had been made to a question asked Dr. Caprio, the court, in making its ruling, said: "I don't care how expert he is."

After the Commonwealth and the defense had completed a lengthy questioning of Dr. Caprio, the trial judge asked the witness with whom he had talked in order to get information about the defendant. Dr. Caprio replied that he had spoken to the members of defendant's family and to his counsel. The court then asked whether he had talked to

any of defendant's former associates or employers or the police. The witness said he had not. Thereupon the court continued questioning the witness:

"Q. Then the only thing you know about this crime is what you gathered from information given to you by Holober himself, his mother, his sister, Mr. Howard (counsel for defendant) and relatives of his? Is that right?

"A. That is right.

"Q. Did you talk to the father of the woman who was killed?

"A. No, sir.

"Q. You say you did not talk to any police about the particulars of the crime?

"A. No, sir.

"Q. Do you make it a practice to conduct your investigations in that manner?"

The witness answered that this was accepted practice. The court continued this line of examination by asking:

"Q. Did you ever talk to people who might be disinterested or unbiased?"

The witness replied that depended on each particular case, and the court then asked:

"Q. What I am getting at is this: Mrs. Holober, or whoever retained you said she thought her son was abnormal?

"A. Your Honor she didn't.

\* \* \*

■ The court then asked:

"Q. Assuming that Charles Holober might be acquitted in this case, and assuming he would get married again,—."

Defendant's counsel promptly objected and the court stopped. After some discussion with counsel, the court told the jury to disregard the question, and further said to counsel: "I don't know whether there is any evidence in here as to whether he is insane." The remark was untimely and out of place because Dr. Caprio had already testified that, in his opinion, Holober definitely was and had been insane for a long time.

After the sister of the defendant had been examined by the attorney for the Commonwealth at great length, the court preceeded to ask her ninety-two questions. These questions were inclined to be critical of the accuracy of her former testimony and tended to discredit her. The statements of the judge and the questions he asked Dr. Caprio implied that there was a question in the court's mind as to the credibility of the conclusion of the witnesses, based upon the information obtained by them.

The issue of the sanity of the defendant was, in the opinion of two of the Commonwealth's witnesses, very close. They thought it presented a border line case. Its determination was vitally important. The life of the defendant was at stake. In view of the high position of a trial judge, his qualifications and experience in determining contested matters, jurors look to him for guidance, and consequently any indication of his evaluation of the facts in issue, by word, demeanor or act, may influence their views. In a case like this, when the principal issue was as close as it admittedly was, it became and was the duty of the judge to exercise the highest caution to avoid any utterance or act implying or evidencing his opinion upon any fact in issue.

We have on numerous occasions enunciated the applicable rule which prevails in Virginia and other jurisdictions in the conduct of criminal trials. 5 M. J., Criminal Procedure, page 383, *et seq.*; *Hicks* v. *Commonwealth*, 178 Va. 261, 264, 16 S. E. (2d) 639.

"In this State, all expressions of opinion, or comments, or remarks upon the evidence, which have a tendency to intimate the bias of the court with respect to the character or weight of the testimony, particularly in criminal cases, are watched with extreme jealousy, and generally considered an invasion of the province of the jury." *Dejarnette* v. *Commonwealth, supra,* (75 Va. page 874).

"The courts and the legislature of this State have been extremely jealous of any expression of opinion by the trial judge upon the weight of the evidence or the credibility of

witnesses. Such expressions have been uniformly held to constitute reversible error. (Citing cases).

"The high official position of the trial judge in a criminal case gives great weight, with the jury, to his words and conduct, and it is incumbent upon him to guard against any manifestation of his opinion either upon the weight of the evidence or the credibility of the witnesses. 'All expressions of opinions, or comments, or remarks, upon the evidence, which have a tendency to intimate the bias of the court with respect to the character or weight of the testimony, particularly in criminal cases, are watched with extreme jealousy and generally considered as invasions of the province of the jury.' " *Mazer* v. *Commonwealth*, 142 Va. 649, 653, 654, 128 S. E. 514.

"It is well, too, to remember that in Virginia, it is the duty of the trial judge to interpret and to apply the law; but it is the peculiar duty of the jury to evaluate the evidence. A judge must not express or indicate by word or deed, an opinion as to the credibility of a witness or as to the weight or quality of the evidence. Any question or act of the judge which may have a tendency to indicate his thought or belief with respect to the character of the evidence is improper, and should be avoided. The impartiality of the judge must be preserved in form and in fact. Our rule as to this has been recently restated by Mr. Justice Eggleston in *Pinn* v. *Commonwealth*, 166 Va. 727, 186 S. E. 169, and by Mr. Justice Hudgins in *Anthony* v. *Commonwealth*, 179 Va. 303, 18 S. E. (2d) 897." *Jones* v. *LaCrosse*, 180 Va. 406, 410, 23 S. E. (2d) 142.

In West Virginia and North Carolina the same rule applies. *State* v. *Perkins*, 130 W. Va. 708, 45 S. E. (2d) 17; *State* v. *Cantrell*, 230 N. C. 46, 51 S. E. (2d) 887.

See also, *O'Shea* v. *People*, 218 Ill. 352, 75 N. E. 981; *Hughes* v. *State*, 70 Ark. 420, 68 S. W. 676; *State* v. *Philpot*, 97 Iowa 365, 66 N. W. 730.

Here the presiding judge took a more active part in the examination of witnesses than was proper. Some of his remarks and questions reflected his views as to the quality

of the evidence, and hence were likely to have influenced the jury in the decision they reached. The court's actions, in their particular settings, might have led the jury to believe that the trial court had little confidence in the credibility of the defendant's witnesses and slight faith in his plea of insanity. This may have been emphasized by the further fact that the court did not undertake to examine either of the psychiatrists testifying for the Commonwealth.

Upon the whole case, we think the conclusion is inescapable that implications arising from the conduct and remarks of the trial court might well have influenced the jury in their finding against the defendant.

The function of a trial judge is to see that the parties have a fair and impartial trial in cases heard before him in keeping with our high traditions of justice. He should see that opportunity is given to develop all pertinent facts. When that has been done, he must be content. This does not prevent him from asking impartial questions of a witness which might shed light on pertinent matters; but the questions should not disclose bias on his part or imply discredit of the integrity or veracity of the witness. *Mazer* v. *Commonwealth, supra; Nelson* v. *Commonwealth,* 153 Va. 909, 150 S. E. 407; *Parsons* v. *Commonwealth,* 154 Va. 832, 152 S. E. 547.

For the reasons given the verdict of the jury must be set aside, the judgment of the trial court reversed, and this case remanded for a new trial.

*Reversed and remanded.*