OPINION
 

 STAMP, District Judge:
 

 David Seeright was convicted on one count of conspiracy to distribute and to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 846 and on three counts of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Seeright to ten years in prison on each of the four counts, each ten year period to run concurrently.
 

 Seeright assigns as error in his appeal the district court’s refusal to suppress certain statements from a proffer session, its questioning of him during the trial, its refusal to permit him to call certain witnesses in support of his Fed.R.Crim.P. 12.3 defense, and the district court’s denial'of several motions for mistrial. Finding no error, we affirm.
 

 I.
 

 In November 1989, a special grand jury for the District of Maryland indicted David Seeright along with seven others in a multi-count indictment .alleging the commission of numerous narcotics crimes. In May 1990, a superseding . indictment was returned adding one count against one of Seeright’s có-defendants. Seeright was charged with conspiracy to distribute and to possess with intent to'distribute cocaine and marijuana. The indictment charged that the conspiracy lasted from January
 
 *844
 
 1983 until June 1986. Seeright was also charged with three counts of possession with intent to distribute cocaine on three different occasions in September and November 1989.
 

 As a result of several ongoing investigations concerning drug trafficking in the District of Maryland, the government decided to interview Seeright. On October 6, 1988, at a previously appointed time and place, Special Agent Alexander Smith of the Drug Enforcement Agency and Assistant United States Attorney Andrew G.W. Norman interviewed Seeright at a Ft. Lauderdale, Florida hotel. Smith and Norman had become aware that Seeright was probably involved in a drug trafficking conspiracy to import large shipments, several hundred kilograms of cocaine each, into the United States. The distribution network included a cartel comprising South American cocaine suppliers and American narcotics distributors. An individual named John Gerald Gerant was believed by the government to have made all arrangements for transportation of the narcotics from Columbia through the Caribbean, usually the Bahamas, to the United States. Gerant was a former Miami policeman turned drug smuggler and pilot. Seeright was one of Gerant’s associates and as a Federal Aviation Administration-licensed mechanic provided. maintenance on Gerant’s fleet ’ of smuggling aircraft. Evidence at trial demonstrated that Seeright was primarily involved in the import of approximately 395 kilograms of cocaine on two occasions, although another 200 kilograms' may have been involved and abandoned in the Bahamas.
 

 The government became aware of See-right’s involvement through the testimony of Gerant, who was cooperating with federal officials, at several of the trials that preceded Seeright’s and Gerant’s trials. Seeright appeared at the October 6, 1988, meeting without counsel, although he had attempted to retain counsel and that lawyer had spoken with Norman. Norman and Smith explained to Seeright that the government could not grant him immunity but was offering him a deal including a plea of guilty to two of the alleged felonies and a maximum term of imprisonment of ten years. Because Seeright was without counsel, Norman explained the government’s offer of the cooperation agreement. Seeright acknowledged that he wanted to proceed with the proffer and, accordingly, signed the letter.
 

 After the meeting, at which Norman took notes, Smith informed Seeright that they thought he was lying and giving false and misleading information. Once See-right was indicted, Norman informed See-right that the government intended, to use his statements from the proffer session against him at trial. The district court in denying Seeright’s motion to suppress the statements found “by clear and convincing evidence” that Seeright had materially breached the proffer agreement by not disclosing his knowledge of the involvement of his friend, a co-defendant named John Kay, in the international drug smuggling operation.
 

 At trial Seeright maintained his intention, which he had previously disclosed to the government, to raise the defense of public authority under Rule 12.3 of the Federal Rules of Criminal Procedure. See-right’s Rule 12.3 defense was based on his assertion that he was helping Gerant, who he knew to be an informant for the Federal Bureau of Investigation. Seeright explained that Gerant had informed him that he was “working” for the FBI. Seeright claimed that he helped Gerant equip planes with long-range fuel tanks for the trips between Florida and Columbia. Seeright asserts that since he was helping Gerant, who was working for the FBI, he, Seeright, was also working for the FBI and not violating any laws.
 

 The government called numerous witnesses who testified that Seeright had never been an informant of any kind for the FBI and that, absent some sort of record of the event, it would have been impossible for Seeright to have been working for that agency. When Seeright testified, the district court cross-examined him concerning his motives for cooperating. Seeright filed a motion for mistrial alleging that the district court had called into question See-
 
 *845
 
 right’s truthfulness and that therefore a fair trial was no longer possible. The court denied the motion and instructed the jury that it alone was to determine the credibility of witnesses.
 

 Next, Seeright attempted to call two additional witnesses in support of his Fed. R.Crim.P. 12.3 defense. Since these witnesses, Walter Henderson and Thomas Godbold, had not been disclosed earlier, and in essence were surprise witnesses, the district court granted the government’s motion to preclude their testimony.
 

 After nearly twelve weeks of trial, the jury began its deliberations on March 26, 1991. On April 1, 1991, the jury foreman advised the court that one juror had, based upon evidence admitted and developed at trial, conducted her own independent investigation to track down a phone number purported to be registered to the FBI in South Florida. After conducting extensive voir dire, the district court dismissed that juror and concluded that the remaining eleven jurors had not been tainted by the extraneous material presented to them by the investigative juror through her improper phone calls. Accordingly, the court denied Seeright’s motion for mistrial. The court also denied Seeright’s motions for a mistrial when Seeright objected to the court’s giving of an
 
 Allen
 
 charge
 
 *
 
 on two occasions when the deadlocked jury sought further instruction from the court.
 

 II.
 

 Seeright appeals on four different grounds. He cites as error and appeals from the district court’s refusal to suppress his statements from the proffer session. He also assigns error in the court’s questioning of him during his trial testimony. He further asserts the court erred in failing to permit him to call certain witnesses in support of his public authority defense pursuant to Fed.R.Crim.P. 12.3. Finally, he assigns as error the court’s denial of his various motions for mistrial made during jury deliberations. Seeright specifically notes the court’s denial of his mistrial motions when the court dismissed a juror and gave two
 
 Allen
 
 charges to the jury.
 

 III.
 

 Seeright first asserts that the district court erred when it admitted certain statements Seeright made during the proffer session with AUSA Norman and Special Agent Smith. In particular, Seeright contends that no consideration was given to him in return for his cooperation and statement and, even if he breached the proffer agreement, the breach was not material and did not, therefore, render the agreement void.
 

 Seeright appeared at the proffer meeting without counsel. The only record of the event is the proffer letter which Seeright signed and the notes taken by Norman. Seeright contends that no consideration existed since the letter does not reflect a grant of immunity from prosecution or a reduction in the charges and potential exposure which he faced. Seeright further contends that since no consideration exists, and therefore no valid contract remains between the parties, that his Fifth Amendment privilege against self-incrimination was violated by the government’s use, and the court’s allowance thereof, of his statements from the proffer meeting.
 

 As the government counters, Seeright was informed by Smith and Norman that he was being given an opportunity, by virtue of the proffer meeting, to meet with the government and reduce his potential exposure to incarceration. The government readily concedes that Seeright was never offered complete immunity. . However, the government maintains that its offer to Seeright that he plead guilty to two felony charges with a maximum exposure of ten years incarceration was substantial consideration in light of the various conspiracy and drug charges which Seeright faced. We agree. A review of the record,
 
 *846
 
 as well as the testimony of Smith and Norman, reveals that the government offered Seeright substantial consideration in return for a valid and truthful proffer. In fact, the conspiracy charge with which Seeright was charged, and for which he was ultimately convicted and sentenced to a term of incarceration, carried a maximum fifteen-year sentence at the time. Seeright’s exposure for the crimes with which he was charged was potentially far greater than the ten years contained in the government’s offer. Accordingly, we find that consideration for the proffer existed.
 

 Seeright next asserts that if, as this Court has found, there was consideration for the proffer, and he breached the agreement, the breach was not material. The government states that Seeright’s breach of the agreement was material because Seeright asserted that his drug activities were sanctioned by Fed.R.Crim.P. 12.3 public authority, Seeright failed to implicate co-defendant John Kay’s involvement in the drug smuggling, and Seeright omitted any reference to his involvement in the first shipment of narcotics to the United States.
 

 The district court found “by clear and convincing evidence” that Seeright had provided false information in his proffer statement and intentionally withheld material evidence, particularly relating to the involvement of co-defendant Kay, during the October 6, 1988, proffer session. As the government noted, other witnesses at trial testified regarding the presence of Seeright and Kay at the same drug transactions and meetings.
 

 Once the district court found that See-right had materially breached the agreement, the government was free to use See-right’s statements from the proffer session.
 
 United States v. Donahey,
 
 529 F.2d 831, 832 (5th Cir.)
 
 (per
 
 curiam),
 
 cert. denied,
 
 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976). In
 
 Donahey,
 
 the court found that the defendant had breached a cooperation agreement by giving evasive and misleading answers and refusing to answer certain questions.
 
 Id.
 
 In a case somewhat related to this one, a district court in the District of Maryland determined that the defendant had materially breached a proffer or cooperation agreement by withholding evidence regarding his involvement in cocaine trafficking.
 
 United States v. Gerant,
 
 775 F.Supp. 182, 186 (D.Md.1991).
 

 This Court finds that Seeright materially breached his agreement with the government. Seeright asserts that any breach was not material because he was not represented by counsel; the only record of the meeting was contained in Norman’s notes, which were not provided to him; and the government asked him general questions. None of these purported factors alters See-right’s material breach of the agreement. Seeright was given an opportunity to have counsel present and, for whatever reason, chose not to have counsel attend. Secondly, Smith and Norman testified as to their own memory concerning the proffer session. Norman’s notes were used in a very limited fashion to refresh their memory as to certain points. Thirdly, the record reflects that Special Agent Smith’s questioning of Seeright, which Seeright claims to be of a general nature, was consistent with Smith’s normal questioning procedures. None of these factors, alone or collectively, rise to the level of a defense to Seeright’s material breach. The district court was in the best position to determine whether See-right breached the agreement, and we find that it did not err in finding that Seeright breached the agreement and in permitting the government to use Seeright’s statements from the proffer session.
 

 IV.
 

 Seeright next insists that the district court abused its discretion and committed reversible error when it questioned him during the trial. In trial, Seeright testified that by cooperating with Gerant, whom he believed to be a federal agent, Seeright was working against the national drug problem and for the good of his children. The court then asked Seeright whether he was concerned that the drugs he was handling would be sold on the street, to which Seeright responded that he had been led to believe that only a very small quantity would actually reach the
 
 *847
 
 street. Shortly thereafter, the court asked Seeright what reports he had made about his cooperating activities. Seeright responded that he made only an oral report to Gerant. We do not believe the court’s questioning of Seeright constitutes an abuse of discretion.
 

 As Seeright acknowledges, Fed.R.Evid. 614(b) permits the court to interrogate witnesses. Seeright argues, however, that the district court’s questioning challenged See-right’s credibility, transforming the court from its proper role as a fair and impartial referee of a trial into an advocate for the government. Seeright insists that the court’s questioning of him, which occurred during a vigorous period of cross-examination, implied disbelief of Seeright’s testimony and doubt about his credibility. See-right also argues that the court’s curative instruction, directing the jury to draw no inference from its questioning of Seeright, accentuated the supposed implications of the court’s interrogation of Seeright.
 

 The government counters that the district court’s questioning of Seeright was consistent with other actions the court had taken, noting that throughout the eleven week trial of this matter the court asked questions of numerous witnesses, favoring neither side over the other. The government argues that the questions posed by the court helped clarify the issues for the jury. The government insists that on the record as a whole, the Court’s questioning of Seeright did not constitute an abuse of discretion.
 

 The Supreme Court has made it clear that a trial court may ask questions of witnesses to bring out needed facts or clarify the presentation of issues.
 
 Glasser v. United States,
 
 315 U.S. 60, 82, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942). In a complex conspiracy case with a large number of individuals, “[the district court] has no more important duty than to see that the facts are properly developed and that their bearing upon the question at issue are clearly understood by the jury.”
 
 Simon v. United States,
 
 123 F.2d 80, 83 (4th Cir.),
 
 cert. denied,
 
 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941). However, “[i]f the trial judge’s behavior ... in interrogating witnesses during trial reaches such a level of prejudice ‘that it denied ... the appellant[ ] a fair, as distinguished from a perfect, trial,’ a new trial is required.”
 
 United States v. Parodi,
 
 703 F.2d 768, 775. (4th Cir.1983)
 
 (quoting United States v. Robinson,
 
 635 F.2d 981, 984 (2d Cir.1980),
 
 cert. denied,
 
 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981)). Considering the record as a whole, Seeright was not denied a fair-trial based upon the district court’s questioning of him.
 

 The trial court’s questions regarding See-right’s concerns about the nation’s drug problem helped the jury focus upon See-right’s motives for acting in aid of this conspiracy. The timing of the questions also focused attention on one of the critical issues in this case: whether Seeright’s actions constituted exercise of public authority under Fed.R.Crim.P. 12.3. The court’s inquiry as to reports Seeright had made of his activities also assisted the jury in its ultimate determination of whether Seeright had established a Rule 12.3 defense. The court’s questioning of Seeright was neither hostile nor disbelieving, and was consistent with the court’s questioning of other witnesses. The court did not interrupt See-right, nor did it badger him. The court properly advised the jury that it was to draw no inference from the court's questions and that only the jury could determine the credibility of the witnesses.
 

 The district court’s questioning of See-right was consistent with Fed.R.Evid. 614(b) and with the. applicable law. The questioning helped clarify the testimony for the jury and focus the jury’s attention upon the critical issues. Considering the court’s questioning of Seeright in light of the entire record in this case, the court did not abuse its discretion and reversal is not warranted.
 

 V.
 

 Seeright also argues that the district court erred when it refused to permit him to call two witnesses, Lieutenant Walter Henderson and Officer Thomas Godbold, to testify in support of his Fed.
 
 *848
 
 R.Crim.P. 12.3 defense. Rule 12.3 requires the defendant to serve the government with written notice of the intention to call witnesses who will testify to a public authority defense. Seeright provided the required notice. Under Rule 12.3(a)(2), the government may request the names and addresses of each of the witnesses upon whom the defendant will rely to establish the Rule 12.3 defense. The government in this case requested the list of witnesses, and was provided with certain names prior to January 25, 1991, and additional names on January 28, 1991. Henderson and Godbold were not listed as Rule 12.3 wit-, nesses until March 5, 1991.
 

 Seeright acknowledges that he did not notify the government in writing of his intention to use the witnesses until three days before the witnesses were to be called. He argues, however, that Fed. R.Crim.P. 12.3(a)(2) did not require the disclosure of Henderson and Godbold. See-right also argues that the court’s action refusing to permit the witnesses to testify denied Seeright his Sixth Amendment rights; that the government was neither surprised by the late disclosure nor would it háve been prejudiced if the witnesses had been permitted to testify on the public authority defense; and that the testimony of these witnesses was critical to his defense.
 

 The government responds that the plain language of Rule 12.3(a)(2) requires, upon request from the government, disclosure of all witnesses testifying on a public authority defense, not just those witnesses encompassed by Rule 12.3(a)(1). The government also disagrees with Seeright’s second argument, insisting that the disclosure requirement of Rule 12.3 is not an unconstitutional incursion into the right to compulsory process of witnesses provided under the Sixth Amendment. Finally, the government argues that it was surprised by the late disclosure of the witnesses and would have suffered prejudice had the late-disclosed witnesses been permitted to testify.
 

 Rule 12.3(a)(1) requires the defendant to provide the government with notice “identifying] the law enforcement or Federal intelligence agency and any member of such agency on behalf of which and the period of time in which the defendant claims the actual or believed exercise of public authority occurred.” Rule 12.3(a)(2) states that “the attorney for the Government may serve upon the defendant or the defendant’s attorney a written demand for the names and addresses of witnesses ... upon whom the defendant intends to rely in establishing the [public authority] defense.” Rule 12.3(a)(2) does not limit the required disclosure to the member of the law enforcement or Federal intelligence agency on whose behalf the defendant is believed to be working. Subsection (c) of Rule 12.3 permits the court to exclude the testimony of undisclosed witnesses.
 

 Seeright intended to rely upon Henderson and Godbold to establish his public authority defense, but he did not identify them. The government timely objected to the use of the witnesses’ public authority testimony, and the court sustained the objection. The language of Fed. R.Crim.P. 12.3(a)(2) plainly required timely disclosure of all Rule 12.3 witnesses, which Seeright failed to provide. There is no conflict between the requirements of sub-parts (1) and (2) of Rule 12.3, and the requirements, of each must be met independently of the other. The court acted well within its discretion in refusing to admit the public authority , testimony of Henderson and- Godbold. No error occurred.
 

 Seeright also argues that the district court’s actions under Rule 12.3(c) violated his constitutional right to compulsory process for obtaining witnesses. The burden of establishing that a statute or rule is unconstitutional rests upon the party challenging the constitutionality.
 
 New York State Club Ass’n, Inc. v. City of New York,
 
 487 U.S. 1, 17, 108 S.Ct; 2225, 2236, 101 L.Ed.2d 1 (1988). As the government points out, a district court in the Eastern District of New York recently considered this question, concluding that Rule 12.3 is not unconstitutional.
 
 United States v. Abcasis,
 
 785 F.Supp. 1113 (E.D.N.Y.1992). Comparing the disclosure requirements in Rule 12.3 with similar requirements in Rule
 
 *849
 
 12.1, relating to alibi, the district court concluded that notice is not incompatible with the rights afforded a defendant under the Constitution. We agree. Rule 12.3 ensures that no party will be surprised at trial. It does not prohibit compulsory process of witnesses, but merely requires compliance with simple disclosure rules to guarantee that all parties will receive a fair trial. Further, the. disclosure requirement is consistent with the district court’s duty to ensure a fair and orderly trial. Rule 12.3 of the Federal Rules of Criminal Procedure is not unconstitutional and does not unfairly interfere with Sixth Amendment rights.
 

 Seeright next argues that the government was not surprised by the anticipated testimony of Henderson and Godbold and would not have been prejudiced had they been permitted to testify. We cannot agree. The government in this case made numerous requests of Seeright to ensure that it knew of all anticipated Rule 12.3 witnesses. Seeright did not provide written notice of his proposed use of Henderson and Godbold until a few days before they were to have testified even though Seeright had long known of their existence. The government was surprised by the last minute addition of Henderson and Godbold to the list of 12.3 witnesses. Because of the short time period, as well as the ongoing trial, the government would have been unable to fully probe the proposed testimony or to develop an appropriate response. The government may well have suffered prejudice had the testimony been permitted. The trial court’s actions pursuant to Rule 12.3(c) prohibiting the offered testimony was an appropriate response to Seeright’s failure to comply with the disclosure requirements.
 

 Finally, Seeright argues that the testimony of Henderson and Godbold was critical to the establishment of his Rule 12.3 defense and therefore should have been permitted. However, as discussed above, Rule 12.3(c) permits the trial court to exclude testimony of undisclosed witnesses. The trial judge, who is best able to determine appropriate remedies under circumstances such as these, concluded that exclusion of the testimony was appropriate. We cannot conclude that the district court’s conclusion was clearly erroneous.
 

 Seeright’s failure to list Henderson and Godbold as witnesses on Seeright’s Rule 12.3 defense permitted the district court to exclude the testimony. His failure to timely disclose surprised the government, and permitting the introduction of the testimony would have prejudiced the government. The district court did not abuse its discretion when it refused to permit Henderson and Godbold to testify as to Rule 12.3 matters.
 

 VI.
 

 Seeright argues that the district court erred in denying his motions for a mistrial made during jury deliberations. Seeright insists that the district court abused its discretion and committed reversible error by dismissing a juror instead of granting his motion for mistrial. Furthermore, Seeright contends that the district court should have granted a mistrial instead of giving two
 
 Allen
 
 charges during jury deliberations in response to the jury’s requests for further guidance.
 

 Several days into jury deliberations, the jury foreman informed the court that a juror, specifically juror number 7, had proceeded to conduct an independent investigation of certain evidence, which had already been admitted at trial, and reported her findings to the other members of the jury. Specifically, the juror telephoned a number which was listed in one of the government’s exhibits to verify that the number had at one time been listed to the FBI.
 

 In order that it may determine the extent, if any, of any prejudice of evidence improperly brought before the jury, a district court must evaluate whether there is a “reasonable possibility that the jury’s verdict was influenced by the material that improperly came before it.”
 
 United States v. Barnes,
 
 747 F.2d 246, 250 (4th Cir.1984). The district court questioned every member of the jury individually and specifically found that none of the other eleven mem
 
 *850
 
 bers of the jury had been tainted or prejudiced by the information obtained and reported by juror number 7. The court found, however, that juror number 7 clearly had been influenced by the information she obtained through her independent investigation and, therefore, excused her from further service. Thereafter, the court denied Seeright’s motion for mistrial and instructed the remaining eleven jurors to continue their deliberations. In
 
 United States v. Fisher,
 
 912 F.2d 728 (4th Cir.1990), this Court, in upholding the constitutionality of a panel of less than twelve jurors, stated that, pursuant to Fed. R.Crim.P. 23(b), a district court is permitted to “proceed with eleven jurors should it be necessary to excuse a juror for cause after the jury has retired to consider its verdict, 'quite clearly the occasional use of a jury of slightly less than 12 ... is constitutional’.”
 
 Id.
 
 at 733 (citation omitted).
 

 The district court’s dismissal of juror number 7 was appropriate in light of the circumstances. The court, as well as counsel, extensively questioned the jury to determine if.the extraneous material which came before the jury had tainted or prejudiced any of them. The district court was satisfied that none of the other eleven members of the jury had been influenced by the information and therefore instructed the remaining eleven members to continue with their deliberations. We find no error or abuse of discretion by the trial court in its dismissal of juror number 7 and denial of Seeright’s motion for mistrial.
 

 Lastly, Seeright argues that the district court improperly gave two
 
 Allen
 
 charges. A review of the record reveals, however, that Seeright stated he had no objection to the district court’s first
 
 Allen
 
 charge in response to the jury’s note that it had reached a verdict as to one of the two defendants, but remained deadlocked as to the other. The district court gave a second
 
 Allen
 
 charge, over the objections of both defendants, after the jury notified the district court that it needed further guidance. The court noted that the jury had listened to over eleven weeks of testimony, had been deliberating for a week and that the note hardly indicated that the jury was déadlocked. The court has considerable discretion and is in the best position to gauge whether a jury is deadlocked or able to proceed further with its deliberations. Accordingly, the court gave the jury a second
 
 Allen
 
 charge following the modified charge recommended by this Court in
 
 United States v. Sawyers,
 
 423 F.2d 1335, 1341-43 (4th Cir.1970). The district court’s exercise of discretion was proper and it did not err in denying Seeright’s motion for mistrial.
 

 VII.
 

 For the reasons stated, the judgment of the district court is affirmed.
 

 AFFIRMED.
 

 *
 

 An
 
 Allen
 
 charge is "[a]n instruction advising deadlocked jurors to have deference to each other’s views, that they should listen, with a disposition to be convinced, to each other’s argument.”
 
 Black’s Law Dictionary
 
 74
 
 (6th
 
 ed. 1990);
 
 see Allen v. United States,
 
 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).