46 F.3d 1128
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Nicole HIGGINS, Defendant-Appellant.
 No. 93-5864.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 8, 1994.
Decided Jan. 11, 1995.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Winston-Salem. Richard C. Erwin, Senior District Judge. (CR-93-42)
 Argued: John Clark Fischer, Randolph & Fischer, Winston Salem, NC, for Appellant. Lisa Blue Boggs, Asst. U.S. Atty, Greensboro, NC, for Appellee. On Brief: Walter C. Holton, Jr., U.S. Atty, Greensboro, NC, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and RUSSELL and WILKINSON, Circuit Judges.
 
 OPINION
 PER CURIAM
 
 1
 Appellant Nicole Higgins was convicted by a jury of violating federal drug laws and was sentenced to seventy months' imprisonment. We affirm.
 
 
 2
 * On March 30, 1993, a federal grand jury indicted Higgins and five others on drug conspiracy and distribution charges. The indictment alleged violations of 21 U.S.C. Secs. 841(a)(1), 846. Higgins and one co-defendant, Lisa Stewart, were tried together.
 
 
 3
 The evidence at trial, viewed in the light most favorable to the verdict, established that Higgins was a member of a drug distribution ring run by her cousin, Emmett Monson. Terri Gray, another member of the ring, testified that she packaged heroin with Higgins and Monson at the Stratford Inn in Winston-Salem, North Carolina. Other testimony established that Higgins furnished her co-conspirators with money for the purchase of beepers and the rental of an automobile, picked up money from drug sales, and delivered heroin and cocaine to be sold. Higgins was seen in possession of large amounts of cash. One witness obtained drugs from Monson at Higgins's home; another saw stacks of money in a safe in Higgins's children's bedroom.
 
 
 4
 Agent Sam Slater, a Forsyth County law enforcement officer, testified that he spoke with Higgins at her home in February 1992. According to Agent Slater, Higgins admitted that Monson had lived with her, that she packaged cocaine and heroin at the Stratford Inn with Monson and Gray, and that she delivered drugs to a man named "David."
 
 
 5
 The jury convicted Higgins on all seven counts in the indictment. On appeal, she contends that a portion of the jury instructions were unconstitutional and that the trial court's conduct deprived her of a fair trial.
 
 II
 
 6
 As part of the jury instructions, the district court supplied the following definition of "reasonable doubt":
 
 
 7
 A reasonable doubt exists whenever after careful and impartial consideration of all the evidence in the case, the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge.
 
 
 8
 The court read this definition to the jury twice. No party objected. Citing Cage v. Louisiana, 498 U.S. 39 (1990) (per curiam), and Sullivan v. Louisiana, 113 S.Ct. 2078 (1993), Higgins now argues that the instruction violated her rights under the Fifth Amendment's Due Process Clause. In the absence of a contemporaneous objection, we review the instruction for plain error. United States v. Chavis, 880 F.2d 788, 794 (4th Cir.1989).
 
 
 9
 In Cage, the Supreme Court was confronted with an instruction which stated that the "beyond a reasonable doubt" standard required proof to "a moral certainty." 498 U.S. at 40. The instruction also equated a reasonable doubt with a "grave uncertainty" and "an actual substantial doubt." Id. The Court concluded that the instruction violated the Due Process Clause of the Fourteenth Amendment because the jury could have interpreted it as impermissibly relaxing the government's burden of proof. Id. at 41. That burden, of course, is the familiar one established in In re Winship, 397 U.S. 358 (1970): the prosecution must prove beyond a reasonable doubt every element of a charged offense.
 
 
 10
 The Court's concerns in Cage were twofold. First, it believed that the "grave uncertainty" and "actual substantial doubt" language "plain[ly]" overstated the degree of doubt needed for an acquittal. 498 U.S. at 41. Second, it suggested that the phrase "moral certainty" could invite the jury to rest its verdict on abstract notions of morality, rather than the evidence. Id. In Sullivan, the Court considered an instruction which was conceded to be virtually identical to the one at issue in Cage. The Court concluded that a constitutionally defective reasonable doubt instruction is "structural error," requiring automatic reversal. 113 S.Ct. at 2082-83.
 
 
 11
 In the recent consolidated cases of Victor v. Nebraska and Sandoval v. California, 114 S.Ct. 1239 (1994), the Supreme Court addressed the constitutionality of reasonable doubt instructions from California and Nebraska. At the outset of its discussion, the Court noted that an instruction violates the Constitution only if there is a reasonable likelihood that the jury understood it "to allow conviction based on proof insufficient to meet the Winship standard." Id. at 1243. The Court noted that this standard of review was more relaxed than the one utilized in Cage, which asked whether the jury could have so understood the charge. Id.; cf. 498 U.S. at 41. The Court also emphasized that a challenged word or phrase must be read in context, together with other relevant portions of the instruction. See, e.g., 114 S.Ct. at 1247-48.
 
 
 12
 The California instruction at issue in Sandoval defined reasonable doubt in terms of "a moral certainty" arising from a "comparison and consideration of all the evidence." Id. at 1244. The instruction also stated that the jury was required to have an "abiding conviction" of the defendant's guilt. Id. The Court found that this language did not offend the Constitution. While expressing some reservations about the naked phrase "moral certainty," the Court emphasized that other aspects of the instruction--e.g., the requirement that the jury rest its decision on a "comparison and consideration of all the evidence" adequately told the jurors to base their conclusions only on the evidence. Id. at 1247-48. Thus, unlike the situation in Cage, it was unlikely that the jury would feel free to convict without being convinced that the government had proved its case. Id. at 1248. The Court also emphasized that the "abiding conviction" language conveyed the correct burden of proof. Id. at 1247.
 
 
 13
 The Court applied a similar analysis, and reached the same conclusion, with respect to the Nebraska instruction at issue in Victor. Id. at 1249-51.
 
 
 14
 Although the instruction given in this case contained the phrase "moral certainty," it also told the jury, in no uncertain terms, that the verdict must be anchored in the evidence. Moreover, unlike the language that was struck down in Cage, the instruction at issue here did not equate a reasonable doubt with a "grave uncertainty." In light of these important distinctions, we conclude that the instruction here did not rise to the level of plain error. See United States v. Olano, 113 S.Ct. 1770, 1770 (1993) (plain errors are those which are "clear" or "obvious").
 
 
 15
 Indeed, though we need not decide the question, we doubt the instruction gave rise to error of any kind. Victor and Sandoval clearly instruct that lower courts should not reduce the constitutional analysis of reasonable doubt instructions to a search for particular "buzzwords." Here, as in Victor and Sandoval, the words "moral certainty" were surrounded with clarifying language which tended to ameliorate any confusion about the government's burden of proof.
 
 
 16
 We have previously cautioned district courts in this circuit "to refrain from attempting any definition" of reasonable doubt. United States v. Reives, 15 F.3d 42, 44 (4th Cir.), cert. denied, 114 S.Ct. 2679 (1994). We reiterate that admonition today, but conclude that the instruction given in this case did not give rise to plain error.
 
 III
 
 17
 During the trial, the district court posed questions to virtually all of the witnesses. In general, of course, such conduct is not remarkable. "The Supreme Court has made it clear that a trial court may ask questions of witnesses to bring out needed facts or clarify the presentation of issues." United States v. Seeright, 978 F.2d 842, 847 (4th Cir.1992). Higgins contends, however, that the court's inquiries tended systematically to support the government's witnesses while belittling the defense case. She maintains that the trial judge's conduct was so prejudicial as to deny her a fair trial. Because Higgins did not object to the district court's conduct, our review once again is only for plain error. Chavis, 880 F.2d at 794.
 
 
 18
 Higgins first challenges one instance in which the trial judge commented favorably on a prosecution witness's testimony. In the course of confirming the witness's understanding of his plea agreement, the Court stated, "Your final understanding is that ... you're going to testify truthfully, as you now appear to be doing?" Inasmuch as this comment implied that the court gave credence to the witness's testimony, we agree that it is troublesome.
 
 
 19
 The trial court's statement must, however, be assessed in light of the entire record. Glasser v. United States, 315 U.S. 60, 83 (1942). Higgins is entitled to reversal of her conviction only if the record contains "evidence of partiality or bias that might indicate a belief on the judge's part that the defendants were 'guilty' or suggest that he had usurped the function of prosecutor." United States v. Parodi, 703 F.2d 768, 776 (4th Cir.1983); see also United States v. Seeright, 978 F.2d 842, 847 (4th Cir.1992).
 
 
 20
 We have carefully reviewed the record, and do not believe the judge's comments denied Higgins a fair trial. Apart from the isolated remark quoted above, the judge did not comment on anyone's credibility and did not in any way convey the impression that he believed Higgins was guilty. Moreover, at the conclusion of the four-day trial the judge instructed the jurors not to infer, from his questions, that he held any opinion on the matters to which the questions related. The instruction also informed the jurors that they were at liberty to disregard the court's comments in arriving at their factual findings. As in Parodi, we think the judge's "disclaimers of any purpose of influencing the jury" support the conclusion that his comments did not deny Higgins a fair trial. 703 F.2d at 778; see also Seeright, 978 F.2d at 847.
 
 
 21
 Higgins points out that the judge asked many of the witnesses detailed and intrusive questions about their employment and family backgrounds. Some of these questions were clearly irrelevant, and we do not condone them. But the court posed such inquiries to both prosecution and defense witnesses, negating any inference of partiality or bias. See Seeright, 978 F.2d at 847. Indeed, some especially unflattering information came to light during the judge's interrogation of the government's witnesses. Moreover, defense counsel himself elicited testimony of this character when his client took the stand.
 
 
 22
 In sum, the record as a whole demonstrates that the trial judge presided over Higgins's trial without bias or prejudice, and in a manner which assured her a fair trial. See Parodi, 703 F.2d at 776-77. Moreover, the evidence against Higgins was very strong, indicating that any error which might have occurred had little if any prejudicial effect. See Olano, 113 S.Ct. at 1778 (plain error generally requires prejudice). We find no plain error.
 
 IV
 
 23
 For the reasons stated, Higgins's conviction and sentence are
 
 
 24
 AFFIRMED.