COURT OF APPEALS OF VIRGINIA


Present:   Judges Kelsey, Haley and Senior Judge Bumgardner
Argued at Chesapeake, Virginia


JOSE RAMON AISPURO
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0269-09-1                        JUDGE JAMES W. HALEY, JR.
                                                          MARCH 16, 2010
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                            Patricia L. West, Judge

            Moody E. Stallings, Jr. (Jonathan L. Stone; Stallings & Bischoff,
            P.C., on brief), for appellant.

            Kathleen B. Martin, Senior Assistant Attorney General (William C.
            Mims, Attorney General, on brief), for appellee.


                                          I.

        Upon his plea of guilty, Jose Ramon Aispuro ("Aispuro") was convicted in the trial court

of felony child neglect in violation of Code § 18.2-371.1(A). He received a sentence of ten years

imprisonment with all but three years suspended. On appeal, he argues that the sentencing judge

erred by abandoning her neutral, judicial role, showing a clear bias against him and performing a

prosecutorial function. We disagree with Aispuro, and we affirm his sentence.

                                          II.

                                        Facts

        Aispuro was indicted in the trial court on one count of felony child neglect in violation of

Code § 18.2-371.1(A) and one count of aggravated malicious wounding in violation of Code

§ 18.2-51.2(A). Pursuant to an agreement with the attorney for the Commonwealth, the trial

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

court entered an order of *nolle prosequi* as to the aggravated malicious wounding charge. Aispuro entered a guilty plea to the remaining charge, which authorizes a punishment range of between two years and ten years imprisonment and a fine of not more than $100,000. Code §§ 18.2-371.1(A), 18.2-10(d) (punishment range for Class 4 felony). There was no agreement between the parties as to the punishment Aispuro would receive.

At a guilty plea hearing on July 9, 2008, Aispuro told the court he understood the applicable range of punishment. The only evidence introduced at this hearing was a written stipulation between the parties of what the Commonwealth's evidence would have been if the case had gone to trial. According to the stipulation, Aispuro was at home, asleep, on February 1, 2008 when Aispuro's wife woke him up and told him she needed to leave their residence to go to the store. On that day, Aispuro's wife was taking care of M.C., a twelve-month-old child, and M.C.'s older sister, A.C.

The stipulation further states that Aispuro later told the police that he picked up M.C. when she was crying. While Aispuro was walking across the floor of Aispuro's daughter's bedroom, he tripped over A.C. who had apparently moved to a position behind him when he was not looking. Aispuro explained to the police that both he and M.C. fell to the floor and he landed on top of her. When he picked her up, she was not moving and he panicked and shook her. Aispuro then called 911.

Also according to the stipulation, M.C. had surgery on the same day, during which doctors removed a portion of her brain to relieve swelling. Dr. Michelle Clayton, a child abuse pediatrician, stated that she reviewed M.C.'s medical records and, in her opinion, M.C.'s injuries were consistent with: "Inflicted Traumatic Brain Injury, formerly known as Shaken Baby Syndrome, and inconsistent with Defendant's version of events. [Dr. Clayton] would testify that it would take an extremely violent shaking to cause the injuries and subdural hematomas [M.C.]

- 2 -

suffered. Dr. Clayton found a knuckle sized bruise on [M.C.]'s forehead." Also according to the stipulation: "[M.C.] is re-learning how to use the left side of her body and the full extent of her developmental delay is unknown."

The pre-sentence report includes additional information regarding the inconsistency between Aispuro's versions of events mentioned in the parties' stipulation:

> It should be noted that initially when the suspect Mr. Jose Aispuro was contacted first by Dr. Clayton and Lisa Wall he advised that he fell on top of the child by accident and that he fell on top of the child with all of his weight, and that was the only incident that had taken place prior to the child being somewhat irresponsive. When the suspect was advised that the injury that the victim sustained was probably not due to the individual falling on top of the victim, the suspect altered his story to include aggressive shaking. The suspect then started saying maybe he shook the baby too hard because he panicked after the child fell and he appeared to be trying to make up his story as he went. It should also be noted that during the initial interview with Lisa Wall, which I was present the suspect had stated that the child was not crying and later on after I told the suspect during my interview that I had talked to some other witnesses. He did advise the child was crying and he was trying to console the child and that's why he picked the child up.

Aispuro appeared in the circuit court again on September 9, 2008 before a different judge, Patricia West. The defense called one witness, M.C.'s mother, G.C., who testified that she had not wanted charges brought against Aispuro and that M.C. was "doing great. She's recovering very, very good." G.C. further testified that her daughter was seeing occupational and speech therapists and that the therapists were teaching M.C. to be aware of her left arm. G.C. agreed that she did not exactly know the full consequences of her daughter's injuries. Nor did she know whether M.C. would ever be able to attend regular schools. A former Child Protective Services worker also testified that Aispuro had completed anger management and individual counseling, and had, otherwise, done everything requested of him. At the September 9 hearing, the court stated:

THE COURT:        Well, my issue is that I think I need more information – I would like to have more information in a long form presentence report.  *I think I'm going to have to know more.*  I think I would like to have reports from his psychologist who he continues to see.  I'm not going to brush this under the rug.

MR. STALLINGS:    Judge nobody's asking you to brush it under the rug.  We realize how serious it is.

THE COURT:        This is very serious, and a short form presentence report just isn't appropriate.  *I'm going to need a lot more information.*  I appreciate you having the social workers here today because that helped; but I think if you don't want to have his therapist here, you at least need a letter and get the Commonwealth's agreement that the letter would come in.  It might be a good idea to have his therapist here.

                  *    *    *    *    *    *    *

MR. STALLINGS:    I don't really recall judge.  I know that Judge O'Brien took the plea and probably was asked would a short form do and he probably said, yes, fine; but if this court's not comfortable sentencing him on a short form, then that's the end of it.

THE COURT:        I want to know – All I know about him right now is that something happened one night where he hurt a child very severely.

                  *    *    *    *    *    *    *

                  I care about knowing the good about him as well as – right now all I have is this –

MR. STALLINGS:    Judge, that's fine because I mean this – this whole notion that he snapped that the Commonwealth threw out and then you picked upon it concerns me a great deal because there's absolutely no evidence of that except what the CHKD person says in there something must have happened, so I think you are exactly right.  If you want to know more about him, if he's ever snapped in the past, is anything in his background, then I think that's what we should do; and I will have his counselor here.

- 4 -

THE COURT: And if – If you want to get Doctor Clayton here, you can cross-examine her. That might not be a bad idea either.

MR. STALLINGS: I've done that before. It's really kind of pointless. She's never seen a child that wasn't abused.

THE COURT: Well, because the ones that she hasn't – that weren't abused didn't come into court.

MR. POWERS: She has an extensive report if the court would like to see the report.

THE COURT: That would have to be by agreement with Mr. Stallings.

MR. STALLINGS: No, I don't agree at all. I agree with what's in the presentence report.

MR. POWERS: If he would like to subpoena her, he can. I'm not going to waste her time and the fees that routinely get cut down to have her come here on something that's already been pled to. The stipulation is as the stipulation is. He signed off on it. Her findings are in the stipulation. That's the evidence we have before the court.

THE COURT: I think you might want her here. I want her here. How's that? I want her here. I want his therapist here. I want a long form presentence report.

MR. STALLINGS: Yes, ma'am.

THE COURT: I need to know as much as I can know to make a ruling for sentencing in this case; and I'm sorry if the Navy has got to wait, but *I don't do something as serious as this without having full information.*

(Emphasis added).

The court then continued Aispuro's sentencing hearing so that the probation office could prepare a long form pre-sentence report, and so that Dr. Clayton could be present to testify. Between the September 9 hearing and Aispuro's final sentencing hearing, Aispuro moved to withdraw his guilty plea. There was a hearing on Aispuro's motion on December 10, during

which counsel for Aispuro informed the judge that Aispuro had entered his guilty plea in part because of counsel's belief that Dr. Clayton would not testify, that he believed Dr. Clayton would provide irrelevant testimony regarding the aggravated malicious wounding charge dismissed by the Commonwealth pursuant to the plea agreement, and that he would not have advised Aispuro to enter a guilty plea had he known that the trial court would insist on hearing from Dr. Clayton. The trial court explained that the reason she wanted Dr. Clayton to testify was that she wanted more information about M.C.'s injuries. The attorney for the Commonwealth then informed the court that Dr. Clayton was not the physician who provided regular medical care to M.C. Dr. Clayton only examined M.C.'s medical records and offered an opinion as to whether Aispuro's initial statement to the police was consistent with the physical evidence. Upon learning this, the judge decided Dr. Clayton's testimony was not necessary after all, stating, "Maybe it's not Dr. Clayton that I need?" Counsel for Aispuro then withdrew the motion to withdraw the guilty plea.

> MR. STALLINGS: So I – I guess back to my concern is Dr. Clayton. If the court is saying they want a medical update on the child, then that's fine.
>
> THE COURT: That's really what I was looking for.

With the consent of both parties, the judge continued Aispuro's case and ordered that his sentencing hearing would resume on January 6, 2009.

On January 6, the court heard testimony from May Kay Tyson ("Tyson"), a physical therapist who treated M.C. for her injuries, and who told the court that M.C. was two years old, but that her development was similar to that of an eight-to-ten-month-old child. Tyson also stated that M.C. could not walk without assistance and that M.C. needed to wear braces on her feet and a splint on her left arm. By agreement of counsel, Tyson also stated that she had spoken with M.C.'s speech therapist and that her speech development was somewhat delayed. Tyson

stated that M.C. had made significant improvements, but would probably always have difficulty using her left arm. Lisa Wall ("Wall"), of Child Protective Services, also testified as to her investigation of the case. Specifically, she testified that Aispuro told her that he had tripped and fallen on M.C., and then that he had shaken her, but that he told her he did not shake her very hard.

Aispuro took the stand, and his attorney began the examination by reminding him that, at the previous hearing, the court questioned G.C. regarding whether Aispuro could have "snapped."

> A: Yes, sir.
>
> Q: You admitted – or when did you first admit to anyone that you shook the baby?
>
> A: When the paramedics got there. I let them –
>
> Q: Talk – talk to the judge.

Aispuro testified that he landed on top of M.C. after tripping over one of the other children, and that he then panicked and shook her when she failed to respond to his attempts to reassure himself that she was unhurt. On cross-examination, Aispuro responded affirmatively to the question: "So you're sticking to your story that you fell on the child?" Then the judge asked him several questions about the incident, including how Aispuro come to shake M.C. and was Aispuro "annoyed, agitated, and perturbed" at the time of the incident? Aispuro replied that he shook M.C. because he was panicking after he fell on her, but that he was not annoyed or agitated before that time.

Following Aispuro's testimony the judge stated:

> THE COURT: There's one question that I would like to have from Ms. Wall or ask Ms. Wall. Let me pose it to you first. And that was is there any corroboration in her investigation of the fall or did she talk to the children?

                        Is that something you all have any problem with me asking?

MR. STALLINGS:    Talk to the children?  I think the oldest was probably four or three.

THE COURT:        Three.

MR. STALLINGS:    Sure.  That's fine.

THE COURT:        Okay. Any corroboration of the fall?

MS. WALL:         No.  None of the children said that he had fallen or that they were near him to push him to possibly fall.

                        *        *        *        *        *        *        *

MR. STALLINGS:    There's no – no contradiction.

THE COURT:        Right.  There's no – right.  She said that she wasn't near him and didn't trip him, but she's three and I understand that.  I was just – I thought that might be helpful to you actually.  I didn't know it would come out quite that way, but I really wasn't trying to hurt you there.  But that would have made the decision a little bit easier for me if there had been some corroboration of a fall.

After hearing the arguments of the parties, the court sentenced Aispuro to ten years imprisonment with all but three years suspended, followed by ten years of probation.  Aispuro later filed a motion to reconsider his sentence, alleging that the trial judge abandoned her neutral judicial role and became a prosecutor in the case.  Aispuro's motion requested a more lenient sentence or, in the alternative, for the court to void the sentence and refer the case to a different judge for re-sentencing.  This appeal followed.

III.

Standard of Review

Aispuro frames the question presented as whether the trial judge abandoned her judicial role, not whether she erroneously failed to recuse herself from his case – though he did

- 8 -

apparently ask the trial court for recusal in his motion to reconsider sentence. On brief, he relies on Canon 3(E) of Virginia's Canons of Judicial Conduct, which addresses when a judge must disqualify herself from a proceeding, and Wilson v. Commonwealth, 272 Va. 19, 30, 630 S.E.2d 326, 332 (2006), in which our Supreme Court reversed the defendant's conviction after concluding that the trial judge erred in refusing to recuse himself. Our precedents reviewing trial court judges' refusal to recuse themselves are concerned with the presence of bias or prejudice, which, according to Aispuro, tainted his sentencing proceeding in the court below. See Slayton v. Commonwealth, 185 Va. 371, 376, 38 S.E.2d 485, 488 (1946) ("A trial judge must exercise reasonable discretion in determining whether he possesses such bias or prejudice as would deny the defendant a fair trial."); see also Justus v. Commonwealth, 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981), cert. denied, 455 U.S. 983 (1982). Because a judge's failure to recuse herself is reversible error only when the record shows an abuse of discretion, Wilson, 272 Va. at 28, 630 S.E.2d at 331; Deahl v. Winchester Dep't of Social Services, 224 Va. 664, 672-73, 299 S.E.2d 863, 867 (1983), we agree with the Commonwealth that same standard of appellate review applies to this case; that is, we will affirm Aispuro's sentence unless the record shows that an abuse of discretion occurred.

Did the Trial Judge Abandon her Judicial Role?

In this case the guilt of the defendant was not at issue; he had pleaded guilty. Accordingly, the only decision left for the judge was the proper punishment for the crime admittedly committed. Central to that decision were at a minimum two factors: (1) how badly had the child been injured; and (2) what were the circumstances that led to that injury.

According to Aispuro, three circumstances, taken together, demonstrate an impermissible bias against him by the sentencing judge: 1) the trial court's attempt to call a witness; 2) the trial court's alleged violation of the plea agreement between Aispuro and the Commonwealth; and

3) the trial court's questioning of Aispuro during Aispuro's sentencing hearing. For the following reasons, we believe the record does not show that these actions by the trial court constituted an abuse of discretion.

At oral argument, counsel for Aispuro suggested that the trial court adopted a prosecutorial role when she insisted on hearing from a witness, Dr. Clayton, even though the attorney for the Commonwealth did not want to call her as a witness. Aispuro provides no authority for this proposition, and there is some authority for the contrary position. Pendleton v. Commonwealth, 131 Va. 676, 705, 109 S.E. 201, 212 (1921) ("We are of opinion that in a criminal case, under the circumstances above stated, the court has the right, in the exercise of a sound discretion, to call the witness . . . and that there was no error in the action of the trial court under consideration."); but see Hill v. Commonwealth, 88 Va. 633, 639, 14 S.E. 330, 332 (1892) (noting that a court's discretion to call witnesses is "to be very cautiously exercised"). We believe further analysis of this issue to be unnecessary, since the trial judge *did not insist* on calling Dr. Clayton after learning that Dr. Clayton was unlikely to know anything about M.C.'s medical condition, and, in fact, Dr. Clayton never testified. Thus, to decide whether calling Dr. Clayton to the stand was within the court's discretion would be to issue an advisory opinion.

As for the other information introduced into evidence at the trial court's request – for example, Tyson's testimony about M.C.'s medical condition[1] – counsel for Aispuro either failed to object or affirmatively agreed to their admission. When the trial judge mentioned that she wanted more information about the child's medical condition, defense counsel stated: "So I – I guess back to my concern is Dr. Clayton. If the court is saying they want a medical update on the child, then that's fine." And when the judge asked for more information about Aispuro's

---

[1] Testimony regarding the harm caused by the offense is relevant to criminal sentencing. See Walker v. Commonwealth, 25 Va. App. 50, 65, 486 S.E.2d 126, 134 (1997).

background, defense counsel stated: "so I think you are exactly right. If you want to know more about him, if he's ever snapped in the past, is anything in his background, *then I think that's what we should do*, and I will have his counselor here." (Emphasis added). "No litigant can 'be permitted to approbate and reprobate, ascribing error to an act by the trial court that comported with his representations.'" Rahnema v. Rahnema, 47 Va. App. 645, 663, 626 S.E.2d 448, 457 (2006) (quoting Boedeker v. Larson, 44 Va. App. 508, 525, 605 S.E.2d 764, 772 (2004)).

Aispuro also contends that the trial court breached the plea agreement he made with the Commonwealth, specifically an understanding that the Commonwealth would not call any witnesses at sentencing. We perceive at least two problems with this argument. First, the record is unclear as to whether there actually was a plea agreement that limited the Commonwealth's evidence to the facts contained in the parties' stipulation. At the hearing on Aispuro's motion to withdraw his guilty plea, the attorney for the Commonwealth disputed defense counsel's version of the agreement: "I do take issue with one statement Mr. Stallings under his motion . . . that I would not call witnesses at sentencing including Dr. Clayton." And the record includes no written plea agreement to show which of them was right. Second, the plea agreement was the basis for Aispuro's motion to withdraw his guilty plea, which defense counsel voluntarily withdrew when it became clear that Dr. Clayton would not testify. No other motion to enforce the terms of the plea agreement appears in the record. Given these facts, we find that Aispuro has not preserved this issue for appeal. See Rule 5A:18.

Finally we consider the argument that the trial court's questioning of witnesses, especially Aispuro, was an abuse of discretion. Initially, we note that defense counsel invited at least some questioning of Aispuro when, on direct examination, he told him: "Talk to the Judge." Even if defense counsel had not done this, it is not the case that judges are uniformly prohibited from questioning witnesses. "It is not to be inferred from what has been said that a

trial judge may not ask questions of a witness either on his examination in chief or on cross-examination. The practice is common and perfectly permissible." Mazer v. Commonwealth, 142 Va. 649, 655, 128 S.E. 514, 516 (1925); see generally Charles E. Friend, The Law of Evidence in Virginia § 3-14, at 124-25 (6th ed. 2003).[2] Many Virginia decisions emphasize that the trial judge must exercise this discretion cautiously and "should refrain from indicating in any way his views upon the weight or quality of the evidence." Goode v. Commonwealth, 217 Va. 863, 865, 234 S.E.2d 239, 240 (1977). But the dominant rationale for this admonition appears to be the need to prevent the judge from invading the province of the jury. Id.; Spear v. Commonwealth, 213 Va. 599, 601, 194 S.E.2d 751, 752 (1973); Holober v. Commonwealth, 191 Va. 826, 839, 62 S.E.2d 816, 822 (1951); Jones v. La Crosse, 180 Va. 406, 411, 23 S.E.2d 142, 144 (1942); Pinn v. Commonwealth, 166 Va. 727, 731-32, 186 S.E. 169, 170-71 (1926); Mazer, 142 Va. at 653-54, 128 S.E. at 515. In a sentencing proceeding in which the judge is the fact finder these concerns are relaxed. See 1 McCormick on Evidence § 8, at 32

---

[2] Under the federal rules, a "court may interrogate witnesses, whether called by itself or by a party." Fed. R. Evid. 614(b); see also United States v. Villarini, 238 F.3d 520, 536 (4th Cir. 2001) (nothing the "conduct of a court in questioning witnesses is reviewed for abuse of discretion"); United States v. Wilson, 118 F.3d 228, 238 (4th Cir. 1997) (noting the district court "'was simply fulfilling its obligation to clarify confused factual issues or misunderstandings, to correct inadequacies of examination or cross-examination'"); United States v. Seeright, 978 F.2d 842, 847 (4th Cir. 1992) ("The Supreme Court has made it clear that a trial court may ask questions of witnesses to bring out needed facts or clarify the presentation of issues."); United States v. Morrow, 925 F.2d 779, 781 (4th Cir. 1991) (finding "no merit to appellant's claim that he was denied a fair trial because of two questions asked by the court to each of the police officers"); Simon v. United States, 123 F.2d 80, 83 (4th Cir. 1941), cert. denied, 314 U.S. 694 (1941) (noting "it cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or moderator" but rather "sits to see that justice is done" and therefore "should not hesitate to ask questions for the purpose of developing the facts"); United States v. Billups, 522 F. Supp. 935, 959 (E.D. Va. 1981); Hicks v. Commonwealth, 33 Va. App. 561, 535 S.E.2d 678 (2000), rev'd on other grounds, sub nom. Virginia v. Hicks, 539 U.S. 113 (2003); Henshaw v. Commonwealth, 3 Va. App. 213, 218, 348 S.E.2d 853, 856 (1986); 1 McCormick on Evidence § 8, at 33 (6th ed. 2006) ("Not only may the judge examine witnesses called by the parties," he may also "call witnesses whom the parties have chosen not to call at all.").

(6th ed. 2006) (Restrictions on questions that may imply comment are "enforced more laxly in judge-tried cases in all jurisdictions.").

Having reviewed the record with these concerns in mind, we do not believe the judge's questions to Aispuro demonstrated such bias or prejudice as to deny him a fair hearing and we are not persuaded by Aispuro that a contrary result is suggested by Wilson, 272 Va. 19, 630 S.E.2d 326. In Wilson, our Supreme Court reversed the defendant's conviction because comments by the trial judge reflected bias and prejudice against the defendant's attorney. Id. at 30, 630 S.E.2d at 332. The circuit court scheduled the defendant's case for a bench trial before a different judge, and when the case was transferred to a new judge, the defendant requested a trial by jury. Id. at 23, 630 S.E.2d at 328.

> Zaleski admitted that he counseled Wilson to ask for a jury trial specifically because the case was transferred to Judge Griffith. Judge Griffith then attempted to relieve Zaleski from representing Wilson in the case. When Judge Griffith learned that he could not remove Zaleski because Wilson had retained Zaleski to represent him, Judge Griffith ordered that Zaleski be removed from the circuit court's list of court-appointed attorneys "effective immediately." Judge Griffith declared he was "not going to have a court-appointed lawyer who practices that way in this court building," and referred to Zaleski's actions as "shenanigans." During this proceeding, Judge Griffith also ruled that by waiting to request a jury trial until the case was transferred, Wilson waived the 14-day notice period required for admission of juvenile records under Code 19.2-295.1 and that Wilson could not later waive his right to a jury trial.

Id. at 23-24, 630 S.E.2d at 328. When the attorney for the Commonwealth and the defense attorney asked for time to finalize a plea agreement in the case, the trial judge told them that they had already had enough time to negotiate and that the trial would begin, id. at 24, 630 S.E.2d at 329, and the judge continued to insist that the trial proceed even when the attorney for the Commonwealth informed him that he had learned of exculpatory evidence on the eve of trial and for that reason had decided to offer the defendant an agreement in which the defendant would

enter a guilty plea and receive a sentence of twenty years imprisonment with all but four suspended. Id. at 25-26, 630 S.E.2d at 329. After hearing the evidence, the judge found the defendant guilty, and imposed a sentence of sixty years imprisonment with thirty years suspended. Id.

We believe the case before us is easily distinguished from Wilson. The judge in Wilson expressed open hostility toward the defense attorney and tried to have him removed from the list of court-appointed counsel. He also refused to allow the parties to finalize a plea agreement even after he was informed of the recent discovery of exculpatory evidence. Under these circumstances, our Supreme Court found that "Judge Griffith's failure to recuse himself was an abuse of discretion because the record shows that the judge's actions reflected a personal bias and prejudice against Wilson's counsel and raised concerns about the judge's impartiality in the case and about the public's perception of his fairness in the case." Id. at 30, 630 S.E.2d at 332. We do not believe the same can fairly be said of Judge West's actions in this case. Her questions to Aispuro were clearly relevant to her sentencing decision. See Code § 19.2-264.4(B) ("circumstances surrounding the offense" are relevant to capital sentencing); Shifflett v. Commonwealth, 257 Va. 34, 44, 510 S.E.2d 232, 236 (1999) (factors set forth in Code § 19.2-264.4(B) may also be relevant to noncapital sentencing). And, unlike the judge in Wilson, she made no comments suggesting she had prejudged the outcome of Aispuro's case or had decided that Aispuro should serve three years in prison before hearing the evidence and the arguments of the parties. Her efforts to corroborate Aispuro's statement that he fell on M.C. and her own statement – "I care about knowing the good about him as well" – in requesting additional information from the parties are inconsistent with such an interpretation of her actions. Indeed, a judge would be remiss, we believe, in not making such an inquiry, if the parties did not otherwise make that information available. A judge must fashion a sentence appropriate to the

crime, one that is hopefully just for both the defendant and the Commonwealth, and cannot do so with a dearth of information.

IV.

<u>Conclusion</u>

We hold that the record in this case does not show an abuse of discretion by the trial judge. We, therefore, affirm Aispuro's sentence.

<u>Affirmed.</u>